IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

UNITED STATES OF AMERICA *ex rel.*
BEVERLY LANDIS,

                    Plaintiffs,

          v.                                      Case No. 06-2455-CM
                                                  Judge Carlos Murguia
HOSPICE CARE OF KANSAS, INC. and
VOYAGER HOSPICECARE, INC.

                    Defendants.
_____

## UNITED STATES' COMPLAINT

The United States brings this action to recover losses from false claims submitted to the government as a result of the fraudulent course of conduct of the defendants, Hospice Care of Kansas, Inc. ("HCK") and Voyager Hospicecare, Inc. ("Voyager") (collectively "Defendants").  HCK is a subsidiary of Voyager that provides palliative hospice care to terminally ill patients throughout the State of Kansas.  The hospice benefit is only available to Medicare beneficiaries that have a terminal prognosis of six months or less.  From at least 2004 through 2008, defendants submitted hospice claims to Medicare for beneficiaries with knowledge, or with reckless disregard for the fact, that they were not eligible for the hospice benefit.

Defendants' business practices contributed to the submission of false claims for patients ineligible for the hospice benefit.  For example, defendants provided bonuses and other financial incentives to staff - including those with responsibility for admissions and discharges - based upon the number of patients (census) at HCK.  Management

would pressure staff to increase the census by threatening terminations or reductions in hours and resources.  Staff that attended patients were instructed to omit from medical records any observations of patients' improvement, and only to document observations of decline that supported hospice eligibility, in an attempt to avoid payment denials by defendants' fiscal intermediary.  At the same time, defendants knew they had an ineffective compliance program that did not control or meaningfully review the conduct of defendants' branch offices.  Moreover, the process for discharging ineligible patients was unreasonably long and subject to challenge by superiors within the company.  These practices gave staff incentives to admit and retain ineligible patients and made it difficult to discharge patients that were determined to be ineligible.  As a result, defendants billed Medicare millions of dollars for patients with reckless disregard for, or knowledge of, the fact those patients were ineligible for hospice services.

Defendants were repeatedly made aware of these problems.  An outside consultant hired by Voyager to review its operations identified a number of concerns with defendants' compliance and incentive practices.  Staff members also reported compliance concerns to defendants, such as the failure to review questionable patients or discharge ineligible ones.  One employee informed HCK's program integrity director that she felt like "we are playing Russian roulette and just hoping that Medicare won't pull the trigger on us."  Another medical director resigned his position because he felt that defendants were admitting and retaining patients that were ineligible for the hospice benefit.

By submitting claims to Medicare for patients with knowledge of, or in reckless disregard of the fact, that they were not eligible to receive the hospice benefit,

defendants submitted false claims to Federal Health Care Programs in violation of the

False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*

## I.      NATURE OF ACTION

1.      The United States brings this action to recover treble damages and civil

penalties under the FCA, 31 U.S.C. § 3729 *et seq.* and to recover damages and other

monetary relief under the common law or equitable theories of unjust enrichment and

payment by mistake.

2.      The United States bases its claims on defendants knowingly submitting

false or fraudulent claims to Medicare and making or using false statements material to

false or fraudulent claims paid by the United States.

3.      Within the time frames detailed below, defendants submitted false or

fraudulent claims to Medicare with knowledge, in reckless disregard, or in deliberate

ignorance of their falsity.

4.      The claims at issue in this action are false because defendants submitted

claims to Medicare for patients that were not terminally ill and did not qualify for the

hospice benefit.

5.      Defendants engaged in business practices that contributed to the

submission of false claims for ineligible patients.

6.       Defendants and their employees knew, or acted in reckless disregard or

deliberate ignorance of the fact, that they were submitting claims to Medicare for

patients that were ineligible for the hospice benefit.

## II.  JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. § 1367(a).

8.     This Court may exercise personal jurisdiction over defendants pursuant to 31 U.S.C. § 3732(a) and because defendants transact business in the District of Kansas, and caused the submission of false or fraudulent claims in this District.

9.     Venue is proper in the District of Kansas under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c) because defendants have transacted business in this District.

## III.  PARTIES

10.     The United States brings this action on behalf of the Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") (formerly known as the Health Care Financing Administration), which administers the Medicare program.

11.     Relator Beverly Landis ("Landis") is a resident of Kansas and currently a nurse employed by HCK.  On October 19, 2006, Landis filed an action alleging violations of the FCA on behalf of herself and the United States Government pursuant to the *qui tam* provisions of the FCA, 31 U.S.C. § 3730(b)(1).  On April 20, 2007, Landis filed an amended complaint.

12.     Defendant HCK is a company that provides hospice care to patients throughout the State of Kansas, organized under the laws of Kansas.

13.     Voyager purchased HCK on or about September 30, 2004.

14.     Upon information and belief, Voyager is organized under the laws of Delaware with its headquarters in Ft. Worth, Texas.

15.     HCK has operated under the same Medicare provider numbers before, during, and after the purchase by Voyager.

## IV.   THE LAW

16.     The FCA, 31 U.S.C. §§ 3729-33, provides for the award of treble damages and civil penalties for a variety of false and fraudulent practices.

17.     Specifically, 31 U.S.C. 3729(a)(1) (2008) imposes liability on:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval...

18.     Additionally, 31 U.S.C. 3729(a)(1)(B) imposes liability on:

> (a)(1) any person who - (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim...[1]

---

[1]  The FCA was recently amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 (FERA), enacted May 20, 2009.  Although § 3729(a) was amended in various respects, only § 3729(a)(2), which FERA renumbered as § 3729(a)(1)(B), applies to this case by virtue of § 4(f) of FERA, which provides: "The amendments made by this section shall take effect on the date of enactment of the Act and shall apply to conduct on or after the date of enactment, except that (1) subparagraph (B) of section 3729(a)(1), as added by subsection (a)(1), shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. § 3729 *et seq.*) that are pending on or after that date . . . ."  FERA, § 4(f).  Thus, because the conduct in this Complaint is alleged to have occurred from approximately 2004 through at least 2008, this Complaint will rely on the pre-FERA version of 3729(a), with the limited exception that the complaint will rely on the post-FERA version of 3729(a)(1)(B).

19.     Further, the FCA provides that:

> (b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

20.     The standard of proof under the FCA is preponderance of the evidence.

31 U.S.C. § 3731(c).

## V.     THE FEDERAL HEALTH CARE PROGRAMS

## A.     Medicare Part A

21.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services and items.  42 U.S.C. §§ 1395 *et seq*.  HHS is responsible for the administration and supervision of the Medicare program.  CMS is an agency of HHS and directly administers the Medicare program.  The Medicare program has several parts, including Medicare Part A ("Hospital Insurance Benefits for the Aged and Disabled").  42 U.S.C. § 1395c-1395li-4.

22.     The Medicare Part A program is a 100% federally subsidized health insurance system for eligible persons aged 65 and older and persons with qualifying disabilities, who may enroll in the program to obtain benefits in return for payments of monthly premiums as established by HHS.  The benefits covered by the Medicare Part A program include hospice care under 42 U.S.C. §1395x(dd).

6

23.     Under Medicare Part A, institutional health care providers, such as hospitals and hospices, enter into an agreement with Medicare to provide health care services to Medicare patients.  The providers are authorized to bill Medicare for those services.

24.     The United States provides reimbursement for Medicare claims from the Medicare Trust Fund through CMS.  To assist in the administration of Part A of the Medicare Program, CMS contracts with "carriers."  42 U.S.C. §1395u.  Those carriers, also known as "fiscal intermediaries," are responsible for processing the payment of Part A claims to providers on behalf of CMS.  *Id.*  Cahaba Government Benefit Administrators ("Cahaba") is the fiscal intermediary responsible for processing the payment of Part A claims to HCK on behalf of CMS.

25.     Under their contracts with HHS, fiscal intermediaries review, approve, and pay Medicare bills, called "claims," received from providers.  Those claims are paid with federal funds.

26.     In order to get paid, providers fill out and submit claims for payment either by hard copy form or electronically.  These forms contain information related to the patient, the services provided, and the provider.  Medicare relies upon the accuracy and truthfulness of these forms to determine whether and what amounts the provider is owed.  After receiving and processing the claims submitted by the provider, the fiscal intermediary reimburses the provider.

27.     At all relevant times herein, HCK knowingly submitted false claims to Medicare through its contractor, Cahaba GBA.

7

**B.       Hospice Regulations**

28.      Hospice is a program to provide palliative comfort care to patients instead of curative care.  Patients that elect hospice agree to forego aggressive treatment of their terminal diagnosis.

29.      Pursuant to 42 CFR 418.20, "[i]n order to be eligible to elect hospice care under Medicare, an individual must be - (a) Entitled to Part A of Medicare; and (b) Certified as being terminally ill in accordance with § 418.22."

30.      According to 42 CFR 418.3, "terminally ill" means that a person "has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."

31.      Hospice is available to individuals for two initial 90-day periods, and then an unlimited number of 60-day periods, provided the individual's terminal condition is certified in writing by a physician at the beginning of each period.

32.      The initial 90-day period must be certified by (a) the medical director of the hospice or physician-member of the hospice inter-disciplinary group and (b) the individual's attending physician.  For subsequent periods, certification requires only one of the aforementioned physicians.  42 CFR 418.22.

33.      The written certification requires: (1) a statement that the individual's medical prognosis is that their life expectancy is 6 months or less if the terminal illness runs its normal course; (2) specific clinical findings and other documentation supporting a life expectancy of six months or less; and (3) the signature(s) of the physician(s).  *Id.*; Medicare Benefit Policy Manual ("Policy Manual"), Chapter 9, § 20.1.

8

34.     Hospices are paid a per diem rate based on the number of days and level of care provided during the election period.  Policy Manual, Chapter 9, § 40; 42 CFR 418.302.  To be covered, hospice services must be:

> Reasonable and necessary for the palliation and management of the terminal illness as well as related conditions.  The individual must elect hospice care in accordance with § 418.24.  A plan of care must be established and periodically reviewed by the attending physician, the medical director, and the interdisciplinary group of the hospice program as set forth in § 418.56.  That plan of care must be established before hospice care is provided.  The services provided must be consistent with the plan of care.  A certification that the individual is terminally ill must be completed as set forth in § 418.22.

42 CFR 418.200.

35.     Hospices submit claims on a monthly basis to their fiscal intermediaries either by a hard copy form called a UB-04, or by using an electronic file transfer called an electronic data exchange.  Those submissions contain information such as the patient's name and Medicare beneficiary identifier, principal diagnosis, dates of services, level of service, condition codes, and discharge status.  Medicare relies on the accuracy and truthfulness of those claims in determining the proper amount of reimbursement for hospices.

36.     It is a condition of participation that hospices must maintain a clinical record for each hospice patient that contains "correct clinical information."  All entries in the clinical record must be "legible, clear, complete, and appropriately authenticated and

dated..."  42 CFR 418.104 (2008).[2]

37.     To assist providers in determining whether an individual is terminally ill with a 6 month or less prognosis, Cahaba has issued Local Coverage Determinations (LCDs) that set forth certain general and disease-specific clinical variables.

38.     These LCDs also advise that: "If a patient improves or stabilizes sufficiently over time while in a hospice such that he/she no longer has a prognosis of six months or less from the most recent recertification evaluation or definitive interim evaluation, that patient should be considered for discharge from the Medicare hospice benefit."

39.     On November 22, 2005, CMS released a Final Rule, effective January 23, 2006, revising 42 CFR 418, to require hospices to put in place a "discharge planning process that takes into account the prospect that a patient's condition might stabilize or otherwise change such that the patient cannot continue to be certified as terminally ill." 42 CFR 418.26(d).

40.     The commentary to the Final Rule noted that:

> We do not expect that a discharge would be the result of a single moment that does not allow time for some post-discharge planning.  Rather we would expect that the hospice's IDG is following their patient, and if there are indications of improvement in the individual's condition such that hospice may soon no longer be appropriate, then planning should begin. If the patient seems to be stabilizing and the disease progression has

---

[2] The regulation governing clinical records was revised in 2008.  The regulation in effect during the relevant time period was previously located at 42 CFR 418.74, and required that hospices "maintain a clinical record for every individual receiving care and services.  The record must be complete, promptly and accurately documented..."

halted, then it could be the time to begin preparing the patient for alternative care.  Discharge planning should be a process, and planning should begin before the date of discharge.  We have tried to avoid prescriptive time frames for discharge planning, since we have long been aware that merely the attention that hospice services give to a patient can have a beneficial effect, creating the impression that the individual may no longer be actively dying and therefore ineligible for the Medicare hospice benefit.  Therefore, we cannot offer a specific number of days or weeks that a patient may be stable and thus not eligible.  We see this issue as one requiring physician/IDG judgment and would only ask that the judgment be supported by documentation in the medical record indicating the reason why the hospice should continue if there seems to be improvement such that discharge is under consideration.

## VI.    THE IMPROPER CONDUCT OF DEFENDANTS

41.    From 2004 through at least 2008, defendants defrauded the United States through the submission of false or fraudulent claims to Medicare for ineligible hospice patients.

42.    As a result of defendants' submission of claims that were knowingly false, or with reckless disregard or deliberate ignorance of their falsity, the United States was damaged by reimbursing defendants for providing hospice care to patients that were not eligible for the hospice benefit.

43.    In addition to billing Medicare for patients with knowledge of their ineligibility, defendants knew or recklessly disregarded the fact that their business practices would cause the submission of false claims for ineligible patients.

44.    For example, defendants created an incentive for staff to admit and retain inappropriate patients by providing monetary bonuses and other non-monetary incentives based upon meeting census targets set by the defendants.  These included

11

bonuses for staff members with responsibility for admitting, recertifying, and discharging patients.

45.     Defendants threatened staff with reductions in hours or terminations if census fell below targets.

46.     Defendants instructed staff to inaccurately document the condition of patients to make them appear appropriate for hospice to avoid detection if medical files were reviewed by HCK's fiscal intermediary.

47.     Defendants developed procedures that made it difficult to - and delayed - the discharge of inappropriate patients.

48.     Recommendations by staff and physicians to discharge ineligible patients were challenged or ignored.

49.     Defendants' compliance program did not adequately review patients for hospice eligibility and failed to control the conduct of branch offices that were known to admit and retain ineligible hospice patients.

50.     Defendants knew the compliance program was ineffective based on reviews conducted by a third-party consultant retained by Voyager and based on the assessments of HCK's compliance officers.

51.     These practices resulted in the admission, retention, and submission of claims to Medicare for patients that were ineligible for the hospice benefit.

52.     As a result, Medicare paid defendants millions of dollars that should not have been paid.

A.      **Defendants provided financial incentives to staff based on census**

53.     Defendants set aggressive census targets for each HCK branch office to achieve.

54.     Defendants provided staff members with monetary bonuses if the branches hit those census goals.

55.     For example, a Director of Patient Services would receive a certain dollar amount per patient per day for each patient on hospice in excess of that branch's goal.

56.     HCK's Director of Patient Services was responsible for, among other things, "leadership of weekly IDT and staff meetings," and "educat[ing], assist[ing] and promot[ing] professional growth for all clinical staff."  The IDT (interdisciplinary team) or IDG (interdisciplinary group) was composed of individuals responsible for meeting the physical, medical, and psychosocial needs of patients, as well as evaluating patients' conditions, and recommending changes in care, including discharges for ineligible patients.

57.     Directors of Admissions were eligible for bonuses of up to 15% of their salary for meeting census goals.

58.     HCK's Directors of Admissions were responsible for, among other things, supervising admissions nurses and the admissions process, including certification of patients for benefits.

59.     All employees were eligible for regular monthly bonuses based on admissions.

13

60.    Staff, including Medical Directors, branch Executive Directors, and Directors of Patient Services were eligible for ad hoc "spiff" bonuses that were based, in part, on census.

61.    HCK also ran special promotions that gave staff additional opportunities to receive bonuses for admissions and census.

62.    For example, in 2005, HCK implemented "Summer Sizzle," "Christmas Cash Blitz," and "Fall Frenzy" plans in which each staff member was eligible for a $50 or $100 cash award for each referral admitted to HCK.  As evidence of HCK's awareness of the impropriety of this program, staff were warned that "discussing this bonus arrangement with any referral source will disqualify you from any bonuses and could result in sanction and/or termination.  It's a rule we hospices have to live by."

63.    In 2007, HCK implemented an "Efforts to Results" program, in which each member of the interdisciplinary committee was eligible to receive $20 for each admission.

64.    The interdisciplinary committee was composed of the individuals that cared for patients and was responsible for reviewing patients' conditions and recommending discharges for ineligible patients.

65.    In 2007, Voyager launched a promotion in which it would pay for a trip to Cancun for all full-time staff of Hospice Care of Kansas if it maintained an average daily census of 725 patients for 30 consecutive days between September, 2007, and September, 2008.

66.     Defendants were warned by an outside consultant retained by Voyager that incentives based on census could be inappropriate.

67.     In July, 2005, the consultant issued a written review of HCK's Wichita branch, which noted "Certain administrators receive incentive based compensation related to patient admissions when they may be in a position to influence the admission decision."

68.     In December, 2005, the consultant issued another written review of HCK's Lenexa branch, which noted that incentives based on admissions for marketing personnel, "make the hospice more vulnerable to additional scrutiny and action by federal regulators, and should be reviewed by legal counsel."

69.     In March, 2006, an employee in HCK's accounting department raised concerns with HCK's Chief Operating Officer that paying bonuses to individuals with quality assurance functions could constitute a conflict of interest.

70.     The provision of bonuses to staff based on admissions and census created an incentive to admit and retain patients that were ineligible for the hospice benefit.

**B.      Defendants pressured and threatened staff to meet census goals**

71.     At the same time that defendants provided financial incentives to staff for meeting census goals, defendants would pressure staff to meet census targets and threaten adverse consequences if census fell below those targets.

72.     For example, in June, 2005, the Executive Director of Patient Services

sent an e-mail to all branch Directors of Patient Services asking them to prioritize addressing a "plummeting census," and stating that "Failure to bring up the census sadly results in the need to cut hours and staff.  No one likes this type of news but it is reality in the business world."

73.    In June, 2006, the CEO of Voyager sent an e-mail to the CEO and CFO of HCK telling them that the outlook for the remainder of the year was "not acceptable, given the investment we have made in infrastructure and marketing resources and materials," despite the fact that HCK had exceeded budgeted goals for the first six months of the year.

74.    In September, 2007, Voyager's Regional Vice President sent an e-mail to several HCK branch executive directors tying resources - including education - to increasing the census:

> I am getting a lot of requests for increases in salary, education, per visit rates, memberships, etc.  I need each of you to work with your staff and managers to decrease these constant requests for resources.  It is time that we help them understand that while we are a financially viable organization, we contracted through the budget process to be far beyond our current state.  To remain financially viable, we must stay within our budgets.  Of course, with that said, "high water covers a lot of stumps."  In other words, when we get our census up, that will free resources.

75.    Staff received regular communications from superiors informing them of each branch's census goals, current census, and the need to increase census.

76.    Two former HCK nurses, a former marketer, and a former medical director at HCK's McPherson branch, indicated that they experienced increasing pressure to raise the census after Voyager's purchase of HCK.

16

77.     In February, 2005, a Director of Patient Services resigned her position because she said it had shifted from a clinical focus to one of sales and marketing.  In an e-mail, she told the HCK Executive Director of Patient Services that:

> I am a good nurse, which means I'm good at taking care of people.  I believe that being good at taking care of people is also what makes us good leaders and managers.  I believe I am good at managing and taking care of my staff, and I very much enjoy that role...However 'driving the census' and 'getting the sale' as [former HCK CEO] Mark [Rowe] calls it, just is not what I wanted to do when I became a nurse.  He has more than once told me that the census is my responsibility - that's just not what I'm about.

78.     In March, 2006, one HCK Director of Patient Services noted in an e-mail that "everything is driven by census!"

79.     Also in March, 2006, an HCK social worker told one HCK Executive Director that, "Staff can sense that marketers are fighting over referrals...Staff assumes that there is money behind this unprofessional behavior...it feels that we are being driven by numbers and not the desire to provide quality care to our families."

80.     As an example of the effect this pressure had on staff, in May, 2006, another Director of Patient Services sent an HCK Executive Director an e-mail stating, "this DPS is starting to have major panics!!  We had another patient go home to heaven last night, my census is now 27 yes 27 ouch...Any advice I am getting very very very scared!!  I don't want to loose [sic] my job, yes my self confidence is panicing [sic]!!"

81.     In October, 2006, Voyager's former COO sent an e-mail to, among others, the HCK COO and Voyager Regional Vice President, complaining about the census

being 60 patients below its peak, stating "When [the peak] happened, I received e-mails [from] everyone.  Funny at this level I have heard nothing from anyone."  The CEO directed HCK to explain the decrease in census the following week.

82.     In October, 2007, Voyager's Regional Vice President sent an e-mail to the HCK marketing consultants and executive directors stating that the census total was "not acceptable."  The Regional Vice President instructed them to "kick it into high gear" because "This organization operates on two things, patient care and business development.  We are sorely lacking in business development."

**C.     Patients' conditions were misleadingly documented in medical records to reflect eligibility for the hospice benefit**

83.     Staff members at HCK that attended patients were instructed to document patients' conditions in medical records in a misleading manner that omitted improvement and emphasized decline.

84.     For example, in a training document entitled, "Documentation Tips," staff were told, "Remember to chart negative...Celebrate the good things but no need to document."

85.     In that document, staff were also told "Don't document discharge planning" and not to use phrases such as "Stable," "No change," Slow decline," "Discharge will occur on _____ date," or "May possibly not be appropriate for hospice."

86.     In another training document entitled, "Documenting Good Care is NOT Enough: Making a case for Recertification," staff were instructed that a proper recertification note "Accentuates the negatives" but does not use terms such as "Stable,

chronic, unchanged" or "within normal limits."

87.     In another training document, HCK's Director of Program Integrity between approximately 2005 and early 2009 ("Director of Program Integrity A") advised staff to, "Celebrate our patients [sic] good days but don't document them!!!!!"

88.     This message was also conveyed to staff at meetings, according to at least one case manager, the relator, a former medical director at HCK's McPherson branch, HCK's Director of Program Integrity until early 2005 (Director of Program Integrity B), and a former clinical director.

89.     As a result, staff misleadingly documented patients' medical conditions to appear appropriate for hospice.

90.     For example, on December 6, 2006, one of HCK's Advanced Registered Nurse Practitioners ("ARNP"), noted in an e-mail that Patient A's condition was likely chronic, not terminal, that Patient A had gained weight, and had ok oxygen saturation.[3] The ARNP wrote that she "was digging" in drafting Patient A's "History & Physical" - a document purporting to summarize a patient's condition and usually included in a patient's medical records.  Accordingly, despite the ARNP's assessment that Patient A was not terminal and had stabilized, the ARNP wrote in Patient A's History & Physical that Patient A experienced functional decline and should continue services.

91.     Even HCK medical directors documented patients' conditions in an non-

---

[3] A list identifying the individual patients referenced in the complaint will be filed separately under seal.

19

objective manner to make them sound appropriate for hospice care.

92.     For example, with regard to Patient B in December, 2005, a nurse noted that a medical director at HCK's Newton branch had "questioned [patient's] appropriateness since we [transferred] her to our office.  She has tried to make her sound appropriate in her notes."  Previously, on December 20, 2004, HCK's Director of Program Integrity B had written that Patient B's condition was chronic but suggested a meeting with the treatment team to make sure that they were painting a terminal picture.

**D.     Defendants had ineffective training and compliance programs that made it likely they would submit false claims for patients ineligible for the hospice benefit**

93.     Before she left HCK in early 2005, Director of Program Integrity B informed Voyager that HCK needed to develop more consistent and better review processes, procedures, and education for staff.

94.     The consultant retained by defendants also repeatedly told them about weaknesses in their compliance program and the need for more staff training.

95.     In August, 2004, the consultant stated that, while HCK had "some of the structural documentation required of an effective regulatory compliance program...it does not have a fully actualized corporate compliance program."

96.     The consultant also noted that, aside from training in HIPAA regulations, "[t]here is little current documentation of staff training specific to corporate (regulatory) compliance..."

97.     In the consultant's July, 2005, report regarding HCK's Wichita branch, it noted that there were still minimal policies related to corporate compliance, and it still did not have a "fully actualized corporate compliance program."

98.     The consultant also noted that there was still little documentation regarding staff training specific to corporate/regulatory compliance, that compliance and regulatory issues did not appear to receive adequate attention during staff orientation, and that "[c]ertain administrators receive incentive based compensation related to patient admissions when they may be in a position to influence the admission decision."

99.     In the consultant's December, 2005, report regarding HCK's Lenexa branch, it noted that there were still minimal policies related to corporate compliance and it did not have a "fully actualized corporate compliance program."

100.     In the report, the consultant also noted that compliance and regulatory issues did not appear to receive adequate attention during staff orientation, and highlighted the fact that marketing personnel received incentive bonuses based on admissions to the hospice.

101.     In 2005, in response to the consultant's report, Director of Program Integrity A drafted a "Plan of Corrections" claiming that the practice of incentive-based payments to marketing representatives was discontinued.  In fact, those practices continued through at least 2007.

102.     In the consultant's October, 2007, report regarding HCK's Wichita branch, it again noted that the branch did not yet have a "fully actualized corporate compliance

21

program."

103.  The consultant also noted that compliance and regulatory issues still did not receive adequate attention during staff orientation.  For example, the consultant noted that Patient Case Managers reported never receiving specific training on hospice conditions of participation.

104.  The consultant again highlighted the practice of providing marketing personnel incentive bonuses based on admissions, and that such practices could draw scrutiny when such employees can influence admissions.

105.  In the consultant's November, 2007, report regarding HCK's Lenexa branch, it again noted that the branch's compliance program "lack[ed] process and is therefore well short of a fully actualized corporate compliance program."  The report went on to note that, although documentation had improved, "[g]enerally, the compliance function has not received the attention our 2005 report would suggest was warranted."

106.  The consultant also noted that interviews with staff suggested that training on Medicare's conditions of participation was "generally meager."  The report went on to note that "compliance and regulatory issues do not appear to receive adequate attention" in staff orientation, and that this "continues to be an issue from [our] first report in 2005."

107.  The consultant noted that the HCK Compliance Officer was located in Wichita and "not as familiar" with Lenexa.

108.    The consultant also wrote that Voyager had been developing a company-wide compliance program since 2004, so branches were not developing new compliance policies and procedures.

109.    In fact, Voyager did not start discussing a company-wide compliance program until 2007, and one was not implemented until the end of 2007.

110.    In 2007, when informed that HCK must wait until the Voyager program was implemented, HCK's compliance officer observed in an e-mail that HCK's existing policies and procedures "stink!"

**E.      Defendants were aware that they were admitting and retaining ineligible patients**

111.    Defendants were told numerous times by their outside consultant and staff that HCK was admitting and retaining ineligible patients.

112.    The consultant hired by Voyager to review the operations of HCK also warned that HCK was at risk of admitting patients ineligible for hospice.

113.    In the consultant's December, 2005, review of the Lenexa branch, it reviewed the medical charts of 11 patients and found that five had some "problematic" elements of documentation.

114.    The consultant warned that, "If extrapolated to the entire census our findings could suggest a significant number of patients may not have documentation to support their continued admission.  Although that scenario is unlikely the site should still consider appropriately discharging patients who, in fact, appear clinically stable."

115.    In its October, 2007, review of Wichita, the consultant reviewed the medical charts of 15 patients and found that seven "exhibited problematic documentation" and that four "had documentation that failed to support the criteria for admission and/or continued stay for the admission terminal diagnosis."

116.    The consultant also warned that the "significant level of patients on service over 180 days and our findings that almost half of the records we reviewed could be questionable for eligibility should be considered a concern of some importance to management and staff."

117.    In its November, 2007, review of Lenexa, the consultant similarly warned that the "significant level of patients on service over 180 days, the high percentage of non-cancer patients and our findings that almost half of the records we reviewed could be questionable for eligibility should be considered a point of interest to management and staff."

118.    In November, 2006, HCK's Chief Medical Officer sent an e-mail informing, among other people, Director of Program Integrity A, and the Voyager Regional Vice President, that roughly a third of the patients referred at the Lenexa branch were not eligible for hospice, and that "there appears to be a gate-keeping problem that we need to fix up front."

119.    Defendants also knew that branch offices failed to review the eligibility of patients with long lengths of stay.  And when those reviews did occur, the discharge recommendations of the ARNP's performing the evaluations, were often ignored.

120.    According to Director of Program Integrity B, HCK's branches in Lenexa, El Dorado, Parsons, and McPherson resisted efforts to review patients and provide training, which resulted in the retention of patients inappropriate for hospice.

121.    According to Director of Program Integrity A, the compliance problems persisted, such that HCK's branches continued to resist performing eligibility reviews, particularly in Lenexa.

122.    In particular, Director of Program Integrity A said that it was difficult to get HCK's Parsons and Hutchinson branches to discharge inappropriate patients.

123.    In June, 2007, the DPS in Parsons acknowledged in an e-mail to the Director of Program Integrity that the Parsons branch was "known for keeping folks on a long time."

124.    In August, 2006, one of HCK's ARNP's sent an e-mail to Director of Program Integrity A asking for help because the medical director at HCK's Newton branch was refusing to discharge patients.

125.    In November, 2006, the same ARNP sent an e-mail to the nurses and executive director of HCK's Hutchinson branch informing them that she needed to review the branch's patients that had extended lengths of stay.  The ARNP noted that "Your branch is especially challenging as their [sic] are still a lot [of patients] on that were questionable or not appropriate the first time I saw them 3-8 months ago."

126.  The ARNP subsequently complained to Director of Program Integrity A that is was difficult to get Hutchinson to participate in the reviews, and that Hutchinson had

not discharged the patients she reviewed and identified as questionable or inappropriate 3-8 months ago.

127.    Director of Program Integrity A acknowledged in an e-mail in November, 2006, that she was unable to meet with Hutchinson to discuss the audits, resulting in concern by Voyager's Regional Vice President.

128.    In January, 2007, the ARNP again wrote to Director of Program Integrity A identifying concerns about the Hutchinson branch.  In the e-mail, the ARNP noted that: (1) one nurse had never discharged a patient and was unaware of the process; (2) the nurse had concerns about the appropriateness of the patient and her supervisors told her not to worry about it; and (3) that "I have told you many times that they do not listen to my suggestions about discharging."  The ARNP concluded that, "I sometimes feel like we are playing Russian roulette and just hoping that Medicare won't pull the trigger on us."

129.    Director of Program Integrity A was also aware that the Wichita branch was admitting patients that were not eligible for hospice.

130.    In September, 2006, the Director of Admissions at HCK's Wichita branch told Director of Program Integrity A that one of the medical directors had noted that "we are having some borderline patients being signed on."

131.    In August, 2006, the Director of Patient Services at HCK's Wichita East branch, e-mailed Director of Program Integrity A that one of the medical directors "has questioned a few of the recent admits.  He's afraid they may not quite meet 'terminal'

criteria." The Director of Patient Services also noted that they had found some admissions that were not terminal.

132.   In February, 2007, Director of Program Integrity A wrote in an e-mail that based on two patients' files she had reviewed, she was "fearful there is a major problem at [Wichita East], or at least what I found in each of these charts leads me to believe such exists."

133.   Defendants also were aware of problems admitting and retaining inappropriate patients at the McPherson branch.

134.   In Fall, 2007, the McPherson medical director resigned because he was uncomfortable with the admissions and recertifications of patients by the branch.

135.   In a resignation letter, the medical director noted that in several instances the branch failed to discharge marginally qualified patients he had approved on the explicit condition that they be discharged if they survived two weeks beyond a crisis.

136.   The medical director also noted that McPherson was "not releasing people from services who obviously no longer qualify."

137.  The medical director noted that "Over the last 2 to 3 months the admissions assessments have become a major problem.  Most of the time I am called when the nurse has minimal information and has not actually assessed the patient."  In addition, the medical director said that the information from the assessments "is not only incomplete but is revealed as being inaccurate when the patient is reviewed at their first IDT."

138.    Defendants were also aware of compliance problems at the Lenexa branch.  Throughout 2005, relator repeatedly informed the Lenexa office manager and HCK's chief medical officer of the fact that HCK was admitting and retaining patients ineligible for hospice.

**F.    Defendants' procedures discouraged the discharge of inappropriate patients**

139.    Despite the complaints from staff that HCK was admitting inappropriate patients and the observations of its outside consultant that Hospice Care of Kansas had an inadequate compliance program, defendants put in place procedures that discouraged and delayed the discharge of ineligible patients.

140.    For example, between 2003 and 2006, HCK staff were repeatedly instructed that HCK's former CEO "must" be involved in "all" discharges, despite the fact that he did not have a medical background.  HCK's former CEO was a social worker who did not attend to patients and was not qualified to make discharge decisions.

141.    In February, 2006, HCK enacted a discharge policy that mandated a 30-day discharge process for every patient "once the determination has been made that a patient no longer meets the requirements for continued services."  The directive was signed by the HCK COO, Director of Program Integrity A, and sent to the Voyager COO. At the end of the 30-day period, the policy required an additional review for eligibility, and a recommendation sent to the "care team" and the President and Vice President "for review, comment, and/or direction."

142.    Patient C is one example of how this policy delayed the discharge of a

28

patient inappropriate for hospice.  Patient C was admitted to HCK as part of its Summer Sizzle promotion on June 24, 2005.  On December 12, 2006, HCK's ARNP noted that Patient C had gained 18 pounds since September, 2006, had improved lab results between July, 2006, and September, 2006, and had oxygen saturation on room air of 95%.  Patient C was not discharged.  On May 3, 2007, HCK's ARNP wrote that Patient C should be discharged.  On May 9, Patient C's Patient Care Coordinator wrote that Patient C was "2 weeks into a 30 day discharge plan."  Patient C was not discharged until June 3, 2007 (Patient C was later readmitted to HCK in February, 2008).

143.  HCK's 30-day discharge process was inconsistent with the commentary to the Final Rule issued by the Centers for Medicare and Medicaid ("CMS") on November 22, 2005, revising 42 C.F.R. § 418, which stated that discharge planning should begin *before* a patient became ineligible for hospice, when "there are indications of improvement in the individual's condition such that hospice may soon no longer be appropriate."

144.  Enacting a policy imposing a blanket 30-day discharge planning process for every patient also made it likely that HCK would be retaining patients ineligible for hospice because it failed to take into account the unique clinical and logistical circumstances present in each patient's case.

145.  HCK's process to discharge a patient also required multiple layers of review to maximize the opportunities to object to discharge.

146.  For example, the discharge decision was not left solely to the discretion of

the medical director or the IDT.

147.    According to an internal document drafted by Director of Program Integrity A on November 30, 2007, the discharge of a patient required the involvement of the care team, the Patient Care Manager, the Director of Patient Care of the branch, the Executive Director of the branch, the Director of Program Integrity, and the Regional Vice President.  Final approval for discharges came from the Director of Program Integrity and Regional Vice President.

148.    Another internal HCK document drafted by HCK's chief medical officer on or about June 30, 2007, indicated that at the Lenexa branch, ineligible patients identified by the IDT would then be reviewed by a "Discharge Planning Committee" composed of the Chief Medical Officer, Executive Director, Director of Patient Services, Patient Care Coordinator, Nurse Case Manager, Social Worker, Home Health Aide, and any other "interested parties."  The document also indicated that non-clinical factors such as "political ramifications" like "referral sources, family, etc." would also be considered.

149.    Patient D is one example of an ineligible patient being retained for non-clinical political reasons.  On January 23, 2007, HCK's ARNP concluded that Patient D was not appropriate for hospice.  On February 14, 2007, the ARNP noted that Patient D had not experienced weight loss, infections, skin issues, or falls since admission to hospice, and Patient D's condition was chronic, not terminal.   The ARNP also noted that the IDT had reviewed Patient D and concluded that Patient D did not meet hospice criteria.  Patient D was finally discharged on February 21, 2007, and then re-admitted

on June 26, 2007 at the insistence of Patient D's sister, an HCK employee.  On July 25, 2007, the Director of Patient Services wrote that Patient D was not considered terminal at that time.  On October 10, 2007, Patient D's Patient Care Manager wrote that Patient D's Nurse Case Manager was "really questioning" Patient D's eligibility, but Patient D's sister worked for HCK and was pushing to keep Patient D on hospice.  On October 11, 2007, HCK's ARNP wrote that Patient D did not need hospice and was not declining. Patient D was not discharged until November 17, 2008.

150.    Yet another internal flow chart indicated that if the IDT determined a patient was inappropriate, that information would be sent to the Director of Program Integrity, and if she agreed, the information would be sent back to the IDT for further review.  If the IDT still agreed to discharge, information would be sent to an "Audit Committee" for more review, after which HCK would begin discharge planning before finally discharging the patient.  The flow chart indicated that the review process would take at least 4 weeks before discharge planning began.

151.    One example of the discharge process delaying the discharge of an ineligible patient is Patient E.  Patient E was admitted to HCK on April 6, 2006.  On May 3, 2007, E wrote that Patient E was asymptomatic, experienced no orthopnea, had increased independent activities of daily living, did not have consistent weight loss, and recommended discharge.  On May 9, 2007, HCK Director of Program Integrity A learned that the discharge process had not yet been started and recommended additional consideration by the IDT.  Patient E was still on hospice on June 6, 2007,

when HCK Director of Program Integrity A was informed that Patient E was scheduled for discharge on June 29, 2007.  Patient E was not discharged until July 12, 2007.

152.    During the review of recommended discharges, the Executive Director of Patient Services and the Regional Vice President would challenge the decisions of the IDT, the Director of Program Integrity, and even medical directors.

153.    For example, in April 2007, the Regional Vice President was informed that the Discharge Planning Committee at Lenexa, including the HCK Chief Medical Officer, had decided discharge was necessary for several patients.  Rather than accepting the decision, the Regional Vice President questioned the determination, saying "We are double sure these patients no longer need our care?"

154.    At the same time, HCK was receiving pressure from Voyager about the number of discharges, which was in turn being passed on to HCK staff.

155.    In February, 2007, Voyager's Senior Vice President of Hospice Operations sent an e-mail to the Voyager Regional Vice President responsible for HCK, saying, "Let's discuss these live discharges.  In some months there's been 10% of the site's census discharged live in a month."

156.    At the beginning of January, 2008, Voyager's Regional Vice President sent e-mails on consecutive days to the branch executive directors stating, "Let's PLEASE try to minimize these [live discharges]," and "We really have to find a way to stop all these live discharges."

**G.    Examples of ineligible patients knowingly admitted or retained by defendants**

157.   The foregoing practices contributed to the improper admission and retention of patients.

158.   The following patients are examples of HCK knowingly admitting, retaining, and billing Medicare for patients that were ineligible for hospice.

159.   Patient 1 began hospice with HCK on April 19, 2005.  On November 29, 2006, HCK's ARNP indicated that Patient 1's eligibility for hospice was questionable because Patient 1 had not experienced any decline during the prior four months.  On January 17, 2007, Patient 1's Nurse Case Manager requested that the branch Executive Director initiate a discharge for Patient 1, noting Patient 1's weight had been consistent between August and January.  On January 26, 2007, Director of Program Integrity A agreed that Patient 1 should be discharged.  Patient 1 was not discharged until February 2, 2007.  Patient 1 was later re-admitted to HCK on March 12, 2009.  Between November 29, 2006 and February 2, 2007, defendants submitted the following claims to Medicare and received the following reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 12/1/06-12/31/06 | 1/4/07 | 1/9/07 | 3980.40 | 3980.38 |
| 1/1/07-1/31/07 | 2/6/07 | 2/9/07 | 3980.40 | 3980.38 |
| 1/1/07-1/31/07 | 3/5/07 | 3/8/07 | 75.92 | 75.92 |
| 2/1/07-2/2/07 | 3/5/07 | 3/8/07 | 256.80 | 256.80 |

160.   Patient 2 began hospice with HCK on December 17, 2005.  On August 15, 2006, HCK's ARNP noted that Patient 2's eligibility for hospice was questionable.  On

August 24, 2006, HCK Director of Program Integrity A and HCK's ARNP concluded that Patient 2 was inappropriate for service, but Patient 2 was not discharged.  On March 31, 2007, HCK's ARNP again noted that Patient 2 was "months if not years away" from being in the end stages of her primary diagnosis.  HCK began discharge planning on April 2, 2007.   Patient 2 was not discharged until April 13, 2007.  Between August 15, 2006 and April 13, 2007, defendants submitted the following claims to Medicare and received the following reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 8/1/06-8/31/06 | 9/6/06 | 9/8/06 | 3933.59 | 3933.58 |
| 9/1/06-9/30/06 | 10/5/06 | 10/9/06 | 3806.70 | 3806.69 |
| 10/1/06-10/31/06 | 11/6/06 | 11/8/06 | 3965.30 | 3980.38 |
| 11/1/06-11/30/06 | 12/6/06 | 12/11/06 | 3852.00 | 3851.98 |
| 12/1/06-12/31/06 | 1/4/07 | 1/9/07 | 3980.40 | 3980.38 |
| 1/1/07-1/31/07 | 2/6/07 | 2/9/07 | 3980.40 | 3980.38 |
| 2/1/07-2/28/07 | 3/5/07 | 3/8/07 | 3595.20 | 3595.18 |
| 3/1/07-3/31/07 | 4/5/07 | 4/10/07 | 3980.40 | 3980.38 |
| 4/1/07-4/13/07 | 5/3/07 | 5/8/07 | 1669.20 | 1669.19 |

161.   Patient 3 began hospice with HCK on October 23, 2004.  Patient 3 was ambulatory, did not require any assistance for his activities of daily living, and demonstrated no signs of deterioration or decline, according to an attending HCK nurse. A nurse raised concerns about Patient 3's eligibility during IDT meetings, but they were dismissed by one of HCK's medical directors.  HCK's ARNP indicated that Patient 3 was

"probably chronic" on May 12, 2006, and November 29, 2006.  On March 12, 2007, HCK's Director of Program Integrity stated that the prior week she "could not find justification for keeping him on service" but the branch objected so she was planning to revisit the issue with them.  Patient 3 was not discharged until May 4, 2007.  Between Patient 3's admission date on October 23, 2004, and his discharge on May 4, 2007, defendants submitted the following claims to Medicare and received the following reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 6/1/06-6/30/06 | 7/6/06 | 7/10/06 | 3806.70 | 3806.69 |
| 7/1/06-7/31/06 | 8/4/06 | 8/9/06 | 3933.59 | 3933.58 |
| 8/1/06-8/31/06 | 9/6/06 | 9/8/06 | 3933.59 | 3933.58 |
| 9/1/06-9/30/06 | 10/5/06 | 10/9/06 | 3806.70 | 3806.69 |
| 10/1/06-10/31/06 | 11/6/06 | 11/8/06 | 3965.30 | 980.38 |
| 11/1/06-11/30/06 | 12/6/06 | 12/11/06 | 3852.00 | 3851.98 |
| 12/1/06-12/31/06 | 1/4/07 | 1/9/07 | 3980.40 | 3980.38 |
| 1/1/07-1/31/07 | 2/6/07 | 2/9/07 | 3980.40 | 3980.38 |
| 2/1/07-2/28/07 | 3/5/07 | 3/8/07 | 3595.20 | 3595.18 |
| 3/1/07-3/31/07 | 4/5/07 | 4/10/07 | 3980.40 | 3980.38 |
| 4/1/07-4/30/07 | 5/3/07 | 5/8/07 | 3852.00 | 3851.98 |
| 5/1/07-5/4/07 | 6/5/07 | 6/8/07 | 513.60 | 513.60 |

162.    Patient 4 was admitted to HCK on December 3, 2001, and discharged on April 25, 2003.  On November 18, 2005, Patient 4 was re-admitted to HCK.  On June 30, 2006, HCK's ARNP noted that Patient 4's eligibility for hospice was questionable.

On July 5, 2006, one of HCK's ARNP's noted that Patient 4 had gained weight and not declined, so HCK Director of Program Integrity A recommended that the Director of Patient Services responsible for Patient 4 closely review Patient 4's eligibility.  On October 24, 2006, one of HCK's ARNP's concluded that Patient 4 was inappropriate for hospice, and noted that there had been no changes during the prior six months and Patient 4 had gained weight.  On November 1, 2006, one of HCK's ARNP's noted that Patient 4 was inappropriate for hospice and had a stable Palliative Performance Score.  On or about July 7, 2007, one of HCK's ARNP's again noted that Patient 4's diagnosis was questionable.  Patient 4 remained on hospice until expiring on October 17, 2007.  Between June 30, 2006 and October 17, 2007, defendants submitted the following claims to Medicare and received the following reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 7/1/06-7/31/06 | 8/4/06 | 8/9/06 | 3933.59 | 3933.58 |
| 8/1/06-8/31/06 | 9/6/06 | 9/8/06 | 3933.59 | 3933.58 |
| 9/1/06-9/30/06 | 10/5/06 | 10/9/06 | 3806.70 | 3806.69 |
| 10/1/06-10/31/06 | 11/6/06 | 11/8/06 | 3965.30 | 3980.38 |
| 11/1/06-11/30/06 | 12/6/06 | 12/11/06 | 3852.00 | 3851.98 |
| 12/1/06-12/31/06 | 1/4/07 | 1/9/07 | 3980.40 | 3980.38 |
| 1/1/07-1/31/07 | 2/6/07 | 2/9/07 | 3980.40 | 3980.38 |
| 2/1/07-2/28/07 | 3/5/07 | 3/8/07 | 3595.20 | 3595.18 |
| 3/1/07-3/31/07 | 4/5/07 | 4/10/07 | 3980.40 | 3980.38 |
| 4/1/07-4/30/07 | 5/3/07 | 5/8/07 | 3852.00 | 3851.99 |
| 5/1/07-5/31/07 | 6/5/07 | 6/8/07 | 3980.40 | 3980.38 |

| 6/1/07-6/30/07 | 7/5/07 | 7/10/07 | 3852.00 | 3851.98 |
| 7/1/07-7/31/07 | 8/7/07 | 8/10/07 | 3980.40 | 3980.38 |
| 8/1/07-8/31/07 | 9/20/07 | 9/25/07 | 3980.40 | 3980.38 |
| 9/1/07-9/30/07 | 10/16/07 | 10/30/07 | 3852.00 | 3851.98 |
| 10/1/07-10/17/07 | 11/7/07 | 11/21/07 | 2182.80 | 2244.32 |

163.    Patient 5 began hospice at HCK on December 31, 2004.  On March 7,
2006, HCK's ARNP noted that Patient 5 was "probably not appropriate," had gained
weight and had "ok" oxygen saturation.  On December 12, 2006, HCK's ARNP opined
that Patient 5 was "not appropriate" in March, 2006, had gained 5.7 pounds since then,
and had 92% oxygen saturations on room air.  On June 4, 2007, HCK's ARNP noted
that Patient 5's pain was chronic, Patient 5 had not experienced any weight loss, had
not had a urinary tract infection since October, 2006, and was probably inappropriate.
On September 11, 2007, HCK's ARNP noted that Patient 5 had gained 11.4 pounds in
the prior six months, was very verbal, had not had infections, and "definitely" needed to
be signed off.  On December 4, 2007, HCK's outside consultant reviewed Patient 5's
charts and expressed doubt that Patient 5 was appropriate for hospice.  Patient 5 was
not discharged until August 30, 2008.  Between March 7, 2006, and August 30, 2008,
defendants submitted the following claims to Medicare and received the following
reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
| --- | --- | --- | --- | --- |
| 3/1/06-3/31/06 | 4/5/06 | 4/6/06 | 3536.79 | 3536.73 |

| | | | | |
|---|---|---|---|---|
| 4/1/06-4/30/06 | 5/4/06 | 5/8/06 | 3422.70 | 3422.64 |
| 5/1/06-5/31/06 | 6/6/06 | 6/8/06 | 3536.79 | 3536.73 |
| 6/1/06-6/30/06 | 7/6/06 | 7/10/06 | 3422.70 | 3422.64 |
| 7/1/06-7/31/06 | 8/4/06 | 8/9/06 | 3536.79 | 3536.73 |
| 8/1/06-8/31/06 | 9/6/06 | 9/8/06 | 3536.79 | 3536.73 |
| 9/1/06-9/30/06 | 10/5/06 | 10/9/06 | 3422.70 | 3422.64 |
| 10/1/06-10/31/06 | 11/6/06 | 11/8/06 | 3612.81 | 3649.13 |
| 11/1/06-11/30/06 | 12/6/06 | 12/11/06 | 3531.30 | 3531.42 |
| 12/1/06-12/31/06 | 1/4/07 | 1/9/07 | 3649.01 | 3649.13 |
| 1/1/07-1/31/07 | 2/6/07 | 2/9/07 | 3649.01 | 3649.13 |
| 2/1/07-2/28/07 | 3/5/07 | 3/8/07 | 3295.88 | 3295.99 |
| 3/1/07-3/31/07 | 4/5/07 | 4/10/07 | 3649.01 | 3649.13 |
| 4/1/07-4/30/07 | 5/3/07 | 5/8/07 | 3531.30 | 3531.42 |
| 5/1/07-5/31/07 | 6/5/07 | 6/8/07 | 3649.01 | 3649.13 |
| 6/1/07-6/30/07 | 7/5/07 | 7/10/07 | 3531.30 | 3531.42 |
| 7/1/07-7/31/07 | 8/7/07 | 8/10/07 | 3649.01 | 3649.13 |
| 8/1/07-8/31/07 | 9/20/07 | 9/25/07 | 3649.01 | 3649.13 |
| 9/1/07-9/30/07 | 10/16/07 | 10/30/07 | 3531.30 | 3531.42 |
| 10/1/07-10/31/07 | 11/7/07 | 11/21/07 | 3765.57 | 3765.67 |
| 11/1/07-11/30/07 | 12/10/07 | 12/13/07 | 3644.10 | 3644.20 |
| 12/1/07-12/31/07 | 1/10/07 | 1/15/07 | 3765.57 | 3765.67 |
| 1/1/08-1/31/08 | 2/11/08 | 2/14/08 | 3765.57 | 3765.67 |
| 2/1/08-2/29/08 | 3/13/08 | 3/18/08 | 3522.63 | 3522.72 |
| 4/1/08-4/30/08 | 5/16/08 | 6/20/08 | 3644.10 | 3644.20 |
| 5/1/08-5/31/08 | 6/11/08 | 6/24/08 | 3765.57 | 3765.67 |

164.    Patient 6 started hospice with HCK on April 7, 2005.  On February 28, 2006, Patient 6's diagnosis was changed to dementia, but the ARNP noted that Patient 6 was gaining weight.  In December, 2006, HCK's ARNP suggested Patient 6 be reviewed and recommended discharge.  On May 3, 2007, HCK's ARNP stated that Patient 6 "probably needs to be discharged" and did not meet the criteria for Alzheimer's because Patient 6 was very verbal.  Patient 6 was not discharged until June 15, 2007.  Patient 6 was readmitted to HCK on February 9, 2010.  Between December, 2006, and June 15, 2007, defendants submitted the following claims to Medicare and received the following reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 12/1/06-12/31/06 | 1/4/07 | 1/9/07 | 3649.01 | 3649.13 |
| 1/1/07-1/31/07 | 2/6/07 | 2/9/07 | 3649.01 | 3649.13 |
| 2/1/07-2/28/07 | 3/5/07 | 3/8/07 | 3295.88 | 3295.99 |
| 3/1/07-3/31/07 | 4/5/07 | 4/10/07 | 3649.01 | 3649.13 |
| 4/1/07-4/30/07 | 5/3/07 | 5/8/07 | 3531.30 | 3531.42 |
| 5/1/07-5/31/07 | 6/5/07 | 6/8/07 | 3649.01 | 3649.13 |
| 6/1/07-6/15/07 | 7/5/07 | 7/10/07 | 1765.65 | 1765.70 |

165.    Patient 7 was signed on as part of HCK's "Summer Sizzle bonus program.  On July 10, 2006, HCK's ARNP wrote that Patient 7 was not appropriate and that Patient 7's diagnosis was not at the end stage, there had been no weight loss, and Patient 7 was able to ambulate with a walker.  On December 12, 2006, HCK's ARNP noted that Patient 7 was not appropriate for hospice in July, 2006, had experienced no

weight loss, ambulated with a walker, and had 96% oxygen saturation on room air.  On

August 6, 2007, the Patient Care Coordinator responsible for Patient 7 observed that

Patient 7's condition was "still the same."  On August 8, 2007, HCK's ARNP wrote that

Patient 7 was not appropriate for hospice and should be discharged.  Patient 7 was not

discharged until October 29, 2007.  Between July 10, 2006 and October 29, 2007,

defendants submitted the following claims to Medicare and received the following

reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 7/1/06-7/31/06 | 8/4/06 | 8/9/06 | 3536.79 | 3536.73 |
| 8/1/06-8/31/06 | 9/6/06 | 9/8/06 | 3536.79 | 3536.73 |
| 9/1/06-9/30/06 | 10/5/06 | 10/9/06 | 3422.70 | 3422.64 |
| 10/1/06-10/31/06 | 11/6/06 | 11/8/06 | 3612.81 | 3649.13 |
| 11/1/06-11/30/06 | 12/6/06 | 12/11/06 | 3531.30 | 3531.42 |
| 12/1/06-12/31/06 | 1/4/07 | 1/9/07 | 3649.01 | 3649.13 |
| 1/1/07-1/31/07 | 2/6/07 | 2/9/07 | 3649.01 | 3649.13 |
| 2/1/07-2/28/07 | 3/5/07 | 3/8/07 | 3295.88 | 3295.99 |
| 3/1/07-3/31/07 | 4/5/07 | 4/10/07 | 3649.01 | 3649.13 |
| 4/1/07-4/30/07 | 5/3/07 | 5/8/07 | 3531.30 | 3531.42 |
| 5/1/07-5/31/07 | 6/5/07 | 6/8/07 | 3649.01 | 3649.13 |
| 6/1/07-6/30/07 | 7/5/07 | 7/10/07 | 3531.30 | 3531.42 |
| 7/1/07-7/31/07 | 8/7/07 | 8/10/07 | 3649.01 | 3649.13 |
| 8/1/07-8/31/07 | 9/20/07 | 9/25/07 | 3649.01 | 3649.13 |
| 9/1/07-9/30/07 | 10/16/07 | 10/30/07 | 3531.30 | 3531.42 |

166.   Patient 8 started on hospice at HCK on March 9, 2006.  On October 18, 2006, HCK's ARNP wrote that Patient 8 was not yet appropriate for hospice.  On December 12, 2006, HCK's ARNP noted that Patient 8 had gained nine pounds since October, 2006, ambulated with a walker, and should be discharged.  Patient 8 was discharged on January 2, 2007.  Between October 18, 2006, and January 2, 2007, defendants submitted the following claims to Medicare and received the following reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 3/9/06-3/31/06 | 4/5/06 | 4/7/06 | 2624.07 | 2624.02 |
| 4/1/06-4/30/06 | 5/4/06 | 5/8/06 | 3422.70 | 3422.64 |
| 5/1/06-5/31/06 | 6/6/06 | 6/8/06 | 3536.79 | 3536.73 |
| 6/1/06-6/30/06 | 7/6/06 | 7/10/06 | 3422.70 | 3422.64 |
| 7/1/06-7/31/06 | 8/4/06 | 8/9/06 | 3536.79 | 3536.73 |
| 8/1/06-8/31/06 | 9/6/06 | 9/8/06 | 3536.79 | 3536.73 |
| 9/1/06-9/30/06 | 10/5/06 | 10/9/06 | 3422.70 | 3422.64 |
| 10/1/06-10/31/06 | 11/6/06 | 11/8/06 | 3612.81 | 3649.13 |
| 11/1/06-11/30/06 | 12/6/06 | 12/11/06 | 3531.30 | 3531.42 |
| 12/1/06-12/31/06 | 1/4/07 | 1/9/07 | 3649.1 | 3649.13 |
| 1/1/07-1/2/07 | 2/6/07 | 2/9/07 | 235.42 | 235.43 |

167.   Patient 9 was admitted to HCK on July 26, 2005.  On October 5, 2005, the IDT noted that Patient 9's condition showed "no change."  On February 8, 2006, the IDT noted that Patient 9 had no cough and no shortness of breath, but was on Cipro for an upper respiratory infection.  On February 22, 2006, the IDT noted that Patient 9's

condition showed "no change."  On October 4, 2006, HCK's ARNP questioned Patient

9's eligibility, indicated there had been weight gain, and that Patient 9 had not

experienced much functional decline during the past year.  Patient 9 was discharged on

November 20, 2006 because of stabilization.  Between October 5, 2005, and November

20, 2006, defendants submitted the following claims to Medicare and received the

following reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 10/1/05-10/31/05 | 11/10/05 | 11/23/05 | 3616.34 | 3536.73 |
| 11/1/05-11/30/05 | 12/6/05 | 12/19/05 | 3422.70 | 3422.64 |
| 12/1/05-12/31/05 | 1/6/06 | 1/19/06 | 3536.79 | 3536.73 |
| 1/1/06-1/31/06 | 2/3/06 | 2/7/06 | 3536.79 | 3536.73 |
| 2/1/06-2/28/06 | 3/3/06 | 3/7/06 | 3194.52 | 3194.46 |
| 3/1/06-3/31/06 | 4/5/06 | 4/7/06 | 3536.79 | 3536.73 |
| 4/1/06-4/30/06 | 5/15/06 | 5/16/06 | 3422.70 | 3422.64 |
| 5/1/06-5/31/06 | 6/20/06 | 6/21/06 | 3536.79 | 3536.73 |
| 6/1/06-6/30/06 | 7/5/06 | 7/7/06 | 3422.70 | 3422.64 |
| 7/1/06-7/31/06 | 8/3/06 | 8/7/06 | 3536.79 | 3536.73 |
| 8/1/06-8/31/06 | 9/6/06 | 9/8/06 | 3536.79 | 3536.73 |
| 9/1/06-9/30/06 | 10/4/06 | 10/6/06 | 3422.70 | 3422.64 |
| 10/1/06-10/31/06 | 11/3/06 | 11/7/06 | 3612.81 | 3649.13 |
| 11/1/06-11/20/06 | 12/18/06 | 12/20/06 | 2354.20 | 2354.28 |

168.    Patient 10 began hospice with HCK on April 27, 2006.  On November 17,

2006, HCK's ARNP noted that Patient 10 was not end stage dementia, had gained

weight, and was not appropriate for hospice.  On February 8, 2007, HCK's ARNP re-
evaluated Patient 10 and concluded Patient 10 was not appropriate for hospice.  Patient
10 was not discharged until March 5, 2007.  Patient 10 was readmitted to HCK on April
11, 2008 and discharged again on October 3, 2008.  Between November 17, 2006 and
March 5, 2007, defendants submitted the following claims to Medicare and received the
following reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
| --- | --- | --- | --- | --- |
| 11/1/06-11/30/06 | 12/6/06 | 12/11/06 | 3852.00 | 3851.98 |
| 12/1/06-12/31/06 | 1/4/07 | 1/9/07 | 3980.40 | 3980.38 |
| 1/1/07-1/31/07 | 2/6/07 | 2/9/07 | 3980.40 | 3980.38 |
| 2/1/07-2/28/07 | 3/5/07 | 3/8/07 | 3595.20 | 3595.18 |
| 3/1/07-3/5/07 | 4/5/07 | 4/10/07 | 642.00 | 642.00 |

169.    Patient 11 began hospice with HCK on August 16, 2005.  On December
12, 2006, HCK's ARNP questioned the appropriateness of Patient 11 and noted that
Patient 11 had gained six pounds since July, 2006.  On August 7, 2006, a Director of
Patient Services noted that one of HCK's medical directors and Patient 11's nurse
believed that Patient 11 was inappropriate for hospice, was doing well, and did not meet
hospice criteria.  On February 22, 2007, HCK's ARNP recommended Patient 11 be
discharged because there had been no infections since July, 2006, and there had been
weight gain during the past six months.  Patient 11 was not discharged until April 4,
2007 due to continued improvement in Patient 11's activities of daily living.   Between
December 12, 2006, and April 4, 2007, defendants submitted the following claims to

Medicare and received the following reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 12/1/06-12/31/06 | 1/4/07 | 1/9/07 | 3980.40 | 3980.38 |
| 1/1/07-1/31/07 | 2/6/07 | 2/9/07 | 3980.40 | 3980.38 |
| 2/1/07-2/28/07 | 3/5/07 | 3/8/07 | 3595.20 | 3595.18 |
| 3/1/07-3/31/07 | 4/5/07 | 4/10/07 | 3980.40 | 3980.38 |
| 4/1/07-4/5/07 | 5/3/07 | 5/8/07 | 642.00 | 642.00 |

170.    Patient 12 was admitted to hospice at HCK on October 24, 2005.  On

August 4, 2006, HCK's ARNP wrote that Patient 12 was stable and of questionable

eligibility.  On October 20, 2006, Patient 12 was reviewed by HCK's ARNP and she

again noted that Patient 12 was stable and questionable for hospice.  On December 12,

2006, HCK's ARNP noted that Patient 12 was questionable in October, 2006, had

stabilized, and had not lost any weight since then.  On December 15, 2006, HCK's

ARNP also wrote that if Patient 12 had not lost 10% in the past six to eight months or

declined significantly, she would discharge her from hospice.  Patient 12 was

discharged on February 9, 2007.   Between August 4, 2006, and February 9, 2007,

defendants submitted the following claims to Medicare and received the following

reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 8/1/06-8/31/06 | 9/6/06 | 9/8/06 | 3536.79 | 3536.73 |

44

| 9/1/06-9/30/06 | 10/5/06 | 10/9/06 | 3422.70 | 3422.64 |
| 10/1/06-10/31/06 | 11/6/06 | 11/8/06 | 3612.81 | 3649.13 |
| 11/1/06-11/30/06 | 12/11/06 | 12/6/06 | 3531.30 | 3531.42 |
| 12/1/06-12/31/06 | 1/4/07 | 1/9/07 | 3649.01 | 3649.13 |
| 1/1/07-1/31/07 | 2/6/07 | 2/9/07 | 3649.01 | 3649.13 |
| 2/1/07-2/9/07 | 3/5/07 | 3/8/07 | 1059.39 | 1059.42 |

171.    Patient 13 was admitted to hospice at HCK on January 17, 2006.  On

October 24, 2006, HCK's ARNP wrote that Patient 13 was questionable for hospice

eligibility, and though the Palliative Performance Score had decreased, Patient 13 was

still ambulatory, had no complications since admission in January, 2006, and gained

weight.  On June 7, 2007, HCK's ARNP indicated that Patient 13's eligibility was

"questionable!!"  On June 11, 2007, HCK's ARNP wrote in Patient 13's History and

Physical to "watch" Patient 13 because of the questionable eligibility.  On June 29,

2007, HCK's Director of Program Integrity wrote that if Patient 13 was ambulatory, the

primary diagnosis of End Stage Dementia was inappropriate, and warned that Patient

13 "needs very careful" observation, documentation, and evaluation.  On November 6,

2007, a Patient Care Manager wrote that Patient 13 had been ambulatory for two years,

since admission, had no infections or skin issues, and concluded, "realistically he

probably never should have been admitted in the first place."  Patient 13 was not

discharged until November 30, 2007.  Between October 24, 2006 and November 30,

2007, defendants submitted the following claims to Medicare and received the following

reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 10/1/06-10/31/06 | 11/6/06 | 11/8/06 | 3965.30 | 3980.38 |
| 11/1/06-11/30/06 | 12/6/06 | 12/11/06 | 3852.00 | 3851.98 |
| 12/1/06-12/31/06 | 1/4/07 | 1/9/07 | 3980.40 | 3980.38 |
| 1/1/07-1/31/07 | 2/6/07 | 2/9/07 | 3980.40 | 3980.38 |
| 2/1/07-2/28/07 | 3/5/07 | 3/8/07 | 3595.20 | 3595.18 |
| 3/1/07-3/31/07 | 4/5/07 | 4/10/07 | 3980.40 | 3980.38 |
| 4/1/07-4/30/07 | 5/3/07 | 5/8/07 | 3852.00 | 3851.98 |
| 5/1/07-5/31/07 | 6/5/07 | 6/8/07 | 3980.40 | 3980.38 |
| 6/1/07-6/30/07 | 7/5/07 | 7/10/07 | 3852.00 | 3851.98 |
| 7/1/07-7/31/07 | 8/7/07 | 8/10/07 | 3980.40 | 3980.38 |
| 8/1/07-8/31/07 | 9/20/07 | 9/25/07 | 3980.40 | 3980.38 |
| 9/1/07-9/30/07 | 10/16/07 | 10/30/07 | 3852.00 | 3851.98 |
| 10/1/07-10/31/07 | 11/7/07 | 11/21/07 | 4002.12 | 4092.58 |
| 11/1/07-11/30/07 | 12/10/07 | 12/13/07 | 3960.60 | 3960.56 |
| 12/1/07-12/31/07 | 1/10/08 | 1/15/08 | 4092.62 | 4092.58 |
| 1/1/08-1/31/08 | 2/11/08 | 2/14/08 | 4092.62 | 4092.58 |
| 2/1/08-2/4/08 | 3/13/08 | 3/18/08 | 528.08 | 528.08 |

172.    Patient 14 was admitted to hospice at HCK on April 18, 2006.  On

September 19, 2006, HCK's ARNP wrote that Patient 14 gained weight and

experienced no decline.  On February 19, 2007, HCK's ARNP said that Patient 14

gained seven pounds since the September evaluation, had not had aspiration since

April, 2006, experienced no decline, and recommended that Patient 14 be discharged.

Patient 14 was not discharged until May 11, 2007.  Between September 19, 2006, and

46

May 11, 2007, defendants submitted the following claims to Medicare and received the following reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 9/1/06-9/30/06 | 10/5/06 | 10/9/06 | 3806.70 | 3806.69 |
| 10/1/06-10/31/06 | 11/6/06 | 11/8/06 | 3965.30 | 3980.38 |
| 11/1/06-11/30/06 | 12/6/06 | 12/11/06 | 3852.00 | 3851.98 |
| 12/1/06-12/31/06 | 1/4/07 | 1/9/07 | 3980.40 | 3980.38 |
| 12/1/06-12/31/06 | 1/17/07 | 1/22/07 | 76.08 | 76.08 |
| 1/1/07-1/31/07 | 8/3/07 | 8/9/07 | 4050.86 | 4050.84 |
| 2/1/07-2/28/07 | 8/3/07 | 8/9/07 | 3665.66 | 3665.64 |
| 3/1/07-3/31/07 | 4/5/07 | 4/10/07 | 3980.40 | 3980.38 |
| 3/1/07-3/31/07 | 7/5/07 | 7/10/07 | 70.46 | 70.46 |
| 4/1/07-4/30/07 | 5/3/07 | 5/8/07 | 3852.00 | 3851.98 |
| 4/1/07-4/30/07 | 7/5/07 | 7/10/07 | 70.46 | 70.46 |
| 5/1/07-5/11/07 | 6/5/07 | 6/8/07 | 1412.40 | 1412.39 |

173.    Patient 15 was admitted to hospice at HCK on June 6, 2005.   In December, 2006, HCK's ARNP noted that Patient 15, whose primary diagnosis was chronic pulmonary obstructive disorder, questioned Patient 15's eligibility for hospice, and noted Patient 15 had not had any change in weight, ambulated with a walker, and only used oxygen as needed.  On May 31, 2007, HCK's ARNP wrote that Patient 15 did not use oxygen and ambulated without significant dyspnea.  On June 4, 2007, HCK's ARNP wrote that Patient 15 was probably not appropriate for hospice.  On July 13, 2007, HCK's ARNP wrote that Patient 15 had stabilized and improved and they were

looking at discharge.  Patient 15 was not discharged until August 4, 2007.  Between

December, 2006, and August 4, 2007, defendants submitted the following claims to

Medicare and received the following reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 12/1/06-12/31/06 | 1/4/07 | 1/9/07 | 3649.01 | 3649.13 |
| 1/1/07-1/31/07 | 2/6/07 | 2/9/07 | 3649.01 | 3649.13 |
| 2/1/07-2/28/07 | 3/5/07 | 3/8/07 | 3295.88 | 3295.99 |
| 3/1/07-3/31/07 | 4/5/07 | 4/10/07 | 3649.01 | 3649.13 |
| 4/1/07-4/30/07 | 5/3/07 | 5/8/07 | 3531.30 | 3531.42 |
| 5/1/07-5/31/07 | 6/5/07 | 6/8/07 | 3649.01 | 3649.13 |
| 6/1/07-6/30/07 | 7/5/07 | 7/10/07 | 3531.30 | 3531.42 |
| 7/1/07-7/31/07 | 8/7/07 | 8/10/07 | 3649.01 | 3649.13 |
| 8/1/07-8/4/07 | 9/20/07 | 9/25/07 | 470.84 | 470.86 |

174.    Patient 16 was admitted to hospice at HCK on October 4, 2005.  On

December 12, 2006, HCK's ARNP wrote that Patient 16's eligibility for hospice was

questionable in July, 2006, and though Patient 16 had lost four pounds since then, still

ambulated independently.  On December 15, 2006, HCK's ARNP opined that if HCK

could still show weight loss, it could keep patient 16 on service.  On January 30, 2007,

HCK's ARNP acknowledged that Patient 16 was not appropriate for hospice the prior

summer.  On July 25, 2007, HCK's ARNP acknowledged that Patient 16 "probably

wasn't [appropriate] the 1st year and a half we had [Patient 28]."  Patient 16 was

ultimately discharged on December 24, 2007.  Between the start of Patient 16's term

with HCK on October 4, 2005, and December 15, 2006, defendants submitted the

following claims to Medicare and received the following reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 10/4/05-10/31/05 | 11/17/05 | 11/18/05 | 3194.52 | 3194.46 |
| 11/1/05-11/30/05 | 12/6/05 | 12/9/05 | 3422.70 | 3422.64 |
| 12/1/05-12/31/05 | 1/6/06 | 1/10/06 | 3536.79 | 3536.73 |
| 1/1/06-1/31/06 | 2/3/06 | 2/7/06 | 3536.79 | 3536.73 |
| 2/1/06-2/28/06 | 3/3/06 | 3/7/06 | 3194.52 | 3194.46 |
| 3/1/06-3/31/06 | 4/5/06 | 4/7/06 | 3536.79 | 3536.73 |
| 4/1/06-4/30/06 | 5/4/06 | 5/8/06 | 3422.70 | 3422.64 |
| 5/1/06-5/31/06 | 6/6/06 | 6/8/06 | 3536.79 | 3536.73 |
| 6/1/06-6/30/06 | 7/6/06 | 7/10/06 | 3422.70 | 3422.64 |
| 7/1/06-7/31/06 | 8/4/06 | 8/9/06 | 3536.79 | 3536.73 |
| 8/1/06-8/31/06 | 9/6/06 | 9/8/06 | 3536.79 | 3536.73 |
| 9/1/06-9/30/06 | 10/5/06 | 10/9/06 | 3422.70 | 3422.64 |
| 10/1/06-10/31/06 | 11/17/06 | 11/20/06 | 3612.81 | 3649.13 |
| 11/1/06-11/30/06 | 12/6/06 | 12/11/06 | 3531.30 | 3531.42 |
| 12/1/06-12/31/06 | 1/4/07 | 1/9/07 | 3649.01 | 3649.13 |

175.   Patient 17 was admitted to hospice by HCK on March 23, 2005.  On July

12, 2006, HCK's ARNP wrote that Patient 17 had gained 10 pounds since January 1,

2006, increased mobility, and Patient 17's status had improved.  The ARNP also noted

that one of HCK's medical directors agreed with a plan to discharge Patient 17 at the

end of July because Patient 17 "is just doing too good."  The ARNP further noted that

Patient 17's spouse wanted Patient 17 to be discharged, but HCK convinced the spouse to keep Patient 17 on service to "monitor [Patient 17's] adjustment" to a new nursing home.  On July 12, 2006, HCK's Director of Program Integrity agreed that Patient 17 should be discharged.  Patient 17 was not discharged until September 6, 2006.  Between July 12, 2006 and September 6, 2006, defendants submitted the following claims to Medicare and received the following reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 7/1/06-7/31/06 | 8/4/06 | 8/9/06 | 3733.64 | 3733.67 |
| 8/1/06-8/31/06 | 9/6/06 | 9/8/06 | 3633.64 | 3733.67 |
| 9/1/06-9/6/06 | 10/5/06 | 10/9/06 | 722.64 | 722.65 |

176.    Patient 18 was admitted to hospice by HCK on November 18, 2004.  On December 2, 2005, two HCK ARNP's concluded that HCK should consider discharging Patient 18.  On January 2, 2006, one of HCK's physicians reviewed Patient 18 and wrote that he "did not see objective markers of decline..." and questioned Patient 18's appropriateness for hospice.  On March 8, 2006, HCK's ARNP noted that Patient 18 ambulates daily, refused home health care, had 94% oxygen saturation, clear breath, no cough, and should be a possible discharge.  on September 12, 2006, HCK's Director of Program Integrity noted that HCK's ARNP recommended discharge, that Patient 18 generally did not meet the requirements for end stage Cardiac Obstructed Pulmonary Disorder, was independent in all activities of daily living except bathing and dressing, and ambulated with a walker.  Patient 18 was not discharged until September 5, 2006.

50

Between December 2, 2005, and September 5, 2006, defendants submitted the following claims to Medicare and received the following reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 12/1/05-12/31/05 | 1/6/06 | 1/11/06 | 3536.79 | 3536.73 |
| 1/1/06-1/31/06 | 2/3/06 | 2/7/06 | 3536.79 | 3536.73 |
| 2/1/06-2/28/06 | 3/3/06 | 3/7/06 | 3194.52 | 3194.46 |
| 3/1/06-3/31/06 | 4/5/06 | 4/7/06 | 3536.79 | 3536.73 |
| 4/1/06-4/30/06 | 5/4/06 | 5/8/06 | 3422.70 | 3422.64 |
| 5/1/06-5/31/06 | 6/6/06 | 6/8/06 | 3536.79 | 3536.73 |
| 6/1/06-6/30/06 | 7/6/06 | 7/10/06 | 3422.70 | 3422.64 |
| 7/1/06-7/31/06 | 8/4/06 | 8/9/06 | 3536.79 | 3536.73 |
| 8/1/06-8/31/06 | 9/6/06 | 9/8/06 | 3536.79 | 3536.73 |
| 9/1/06-9/8/06 | 10/5/06 | 10/9/06 | 912.72 | 912.70 |

177.    Patient 19 was admitted to hospice on June 16, 2004.  On January 18, 2006, HCK's ARNP recommended discharge because there was no decline and Patient 19's condition was chronic, not terminal.  On January 23, 2006, one of HCK's nurses agreed that Patient 19's condition was chronic.  On January 31, 2006, the IDT indicated that there had been no changes in Patient 19's condition.  On March 28, 2006, May 9, 2006, and June 23, 2006, the IDT also noted that there were no changes in Patient 19's condition.  Patient 19 was not discharged until June 30, 2006.  Between January 18, 2006 and June 30, 2006, defendants submitted the following claims to Medicare and received the following reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 1/1/06-1/31/06 | 2/3/06 | 2/8/06 | 3955.04 | 3955.01 |
| 2/1/06-2/28/06 | 3/3/06 | 3/8/06 | 3552.92 | 3552.91 |
| 3/1/06-3/31/06 | 4/5/06 | 4/10/06 | 3933.59 | 3933.58 |
| 4/1/06-4/30/06 | 5/4/06 | 5/9/06 | 3806.70 | 3806.69 |
| 5/1/06-5/31/06 | 6/6/06 | 6/9/06 | 3933.59 | 3933.58 |
| 6/1/06-6/30/06 | 7/6/06 | 7/11/06 | 3806.70 | 3806.69 |

178.    Patient 20 was admitted to hospice by HCK on April 22, 2006.  On January 5, 2007, HCK's ARNP wrote that Patient 20 had improved since admission to HCK, no longer had dysphagia, had an increased arm circumference since September, 2006, had not had any infections since September, 2006, and that Patient 20's case manager recommended discharge planning.  On January 8, 2007, Patient 20's case manager noted that Patient 20 was eating well, going out to eat, did not have skin issues, and had overall improvement during the prior two months.  Patient 20 was not discharged until January 23, 2007.  Between September 1, 2006, and January 23, 2007, defendants submitted the following claims to Medicare and received the following reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 9/1/06-9/30/06 | 10/5/06 | 10/9/06 | 3806.70 | 3806.69 |
| 10/1/06-10/31/06 | 1/11/07 | 1/31/07 | 4005.15 | 4005.15 |
| 11/1/06-11/30/06 | 1/11/07 | 1/31/07 | 3852.00 | 3851.98 |
| 12/1/06-12/31/06 | 1/4/07 | 1/9/07 | 3980.40 | 3980.38 |

| | | | | |
|---|---|---|---|---|
| 1/1/07-1/23/07 | 2/6/07 | 2/9/07 | 2977.95 | 2977.95 |

179.    Patient 21 was admitted to hospice by HCK on march 20, 2007.  On

September 5, 2007, HCK's ARNP wrote that Patient 21 was not appropriate for a

diagnosis of end stage dementia, ambulated independently, did not experience weight

loss or infections, and should be discharged.  On October 31, 2007, one of HCK's

medical directors indicated that Patient 21 was inappropriate for hospice.  Patient 21

was not discharged until January 4, 2008.  Between September 5, 2007, and January 4,

2008, defendants submitted the following claims to Medicare and received the following

reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 9/1/07-9/30/07 | 10/16/07 | 10/30/07 | 3852.00 | 3851.98 |
| 10/1/07-10/31/07 | 11/7/07 | 11/26/07 | 4002.12 | 4092.58 |
| 10/1/07-10/31/07 | 1/23/08 | 1/30/08 | 39.85 | 39.85 |
| 11/1/07-11/31/07 | 12/10/07 | 12/14/07 | 3960.60 | 3960.56 |
| 12/1/07-12/31/07 | 1/10/08 | 1/16/08 | 4092.62 | 4092.58 |
| 1/1/08-1/4/08 | 2/11/08 | 2/15/08 | 528.08 | 528.08 |

180.    Patient 22 was admitted to HCK on August 22, 2005, as part of its

Summer Sizzle promotion.  On December 12, 2006, HCK's ARNP wrote that Patient 22

had gained 11 pounds since June, 2006.  On February 8, 2007, HCK's ARNP wrote that

Patient 22 had gained 15 pounds, had not other declines, and should be discharged.

Patient 22 was not discharged until July 18, 2007.  Between December 12, 2006 and

July 18, 2007, defendants submitted the following claims to Medicare and received the

following reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 12/1/06-12/31/06 | 1/4/07 | 1/9/07 | 3649.01 | 3649.13 |
| 1/1/07-1/31/07 | 2/6/07 | 2/9/07 | 3649.01 | 3649.13 |
| 2/1/07-2/28/07 | 3/5/07 | 3/8/07 | 3295.88 | 3295.99 |
| 3/1/07-3/31/07 | 4/5/07 | 4/10/07 | 3649.01 | 3649.13 |

     181.    Patient 23 was admitted to hospice by HCK on January 11, 2007.  On

June 21, 2007, the History and Physical indicates that Patient 23 is capable of

intelligible speech.  On July 10, 2007, HCK's ARNP wrote that Patient 23's weight

increased over the past five months with no functional decline and that both she and the

nurse case manager agree with discharge from hospice.  Patient 23 was not

discharged.  On August 2, 2007, HCK's ARNP wrote that Patient 23 should be

discharged.  On August 22, 2007, Patient 23's nurse case manager noted that Patient

23 had gained 11 pounds since admission, did not require oxygen, had experienced no

infections, and had no skin issues.  Patient 23 was not discharged until September 14,

2007.  Between July 10, 2007, and September 14, 2007, defendants submitted the

following claims to Medicare and received the following reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 7/1/07-7/31/07 | 8/7/07 | 8/10/07 | 3980.40 | 3980.38 |
| 8/1/07-8/31/07 | 9/20/07 | 9/25/07 | 3980.40 | 3980.38 |

| | | | | |
|---|---|---|---|---|
| 9/1/07-9/14/07 | 10/16/07 | 10/30/07 | 1797.60 | 1797.59 |

182.    Patient 24 was admitted to hospice by HCK on January 21, 2005.  On December 12, 2006, HCK's ARNP noted that Patient 24 had gained 14 pounds since March, 2006.  On March 2, 2007, HCK's ARNP indicated that Patient 24 had not experienced any weight loss and HCK's medical director thought that Patient 24 was stable and should be discharged.  Patient 24 was not discharged until March 26, 2007.  Between December 12, 2006, and March 26, 2007, defendants submitted the following claims to Medicare and received the following reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 12/1/06-12/31/06 | 1/4/07 | 1/9/07 | 3649.01 | 3649.13 |
| 1/1/07-1/31/07 | 2/6/07 | 2/9/07 | 3649.01 | 3649.13 |
| 2/1/07-2/28/07 | 3/5/07 | 3/8/07 | 3295.88 | 3295.99 |
| 3/1/07-3/26/07 | 4/5/07 | 4/10/07 | 3060.46 | 3060.56 |

183.    Patient 25 was admitted to hospice by HCK on November 21, 2005.  On April 9, 2006, one of HCK's doctors wrote that the History and Physical did not confirm Patient 25's terminal diagnosis.  On September 12, 2007, the History and Physical indicated that Patient 25 did not experience any pain or shortness of breath, and had gained nine pounds since March, 2007.  HCK's ARNP wrote on September 13, 2007, that Patient 25 was stable from the prior year, was chronic not terminal, and should be discharged.  Patient 25 was not discharged until October 26, 2007.  Between September 1, 2006, and October 26, 2007, defendants submitted the following claims to

Medicare and received the following reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 9/1/06-9/30/06 | 10/5/06 | 10/9/06 | 3422.70 | 3422.64 |
| 9/1/06-9/30/06 | 10/5/06 | 10/9/06 | 3422.70 | 3422.64 |
| 10/1/06-10/31/06 | 11/6/06 | 11/8/06 | 3612.81 | 3649.13 |
| 10/1/06-10/31/06 | 11/6/06 | 11/8/06 | 3612.81 | 3649.13 |
| 11/1/06-11/30/06 | 12/6/06 | 12/11/06 | 3531.30 | 3531.42 |
| 11/1/06-11/30/06 | 12/6/06 | 12/11/06 | 3531.30 | 3531.42 |
| 12/1/06-12/31/06 | 1/4/07 | 1/9/07 | 3649.01 | 3649.13 |
| 12/1/06-12/31/06 | 1/4/07 | 1/9/07 | 3649.01 | 3649.13 |
| 1/1/07-1/31/07 | 2/6/07 | 2/9/07 | 3649.01 | 3649.13 |
| 1/1/07-1/31/07 | 2/6/07 | 2/9/07 | 3649.01 | 3649.13 |
| 2/1/07-2/28/07 | 3/5/07 | 3/8/07 | 3295.88 | 3295.99 |
| 2/1/07-2/28/07 | 3/5/07 | 3/8/07 | 3295.88 | 3295.99 |
| 2/1/07-2/28/07 | 3/5/07 | 3/8/07 | 3295.88 | 3295.99 |
| 3/1/07-3/31/07 | 4/5/07 | 4/10/07 | 3649.01 | 3649.13 |
| 3/1/07-3/31/07 | 4/5/07 | 4/10/07 | 3649.01 | 3649.13 |
| 3/1/07-3/31/07 | 4/5/07 | 4/10/07 | 3649.01 | 3649.13 |
| 4/1/07-4/30/07 | 5/3/07 | 5/8/07 | 3531.30 | 3531.42 |
| 4/1/07-4/30/07 | 5/3/07 | 5/8/07 | 3531.30 | 3531.42 |
| 5/1/07-5/31/07 | 6/5/07 | 6/8/07 | 3649.01 | 3649.13 |
| 5/1/07-5/31/07 | 6/5/07 | 6/8/07 | 3649.01 | 3649.13 |
| 6/1/07-6/30/07 | 7/5/07 | 7/10/07 | 3531.30 | 3531.42 |
| 6/1/07-6/30/07 | 7/5/07 | 7/10/07 | 3531.30 | 3531.42 |
| 7/1/07-7/31/07 | 8/7/07 | 8/10/07 | 3649.01 | 3649.13 |

| | | | | |
|---|---|---|---|---|
| 7/1/07-7/31/07 | 8/7/07 | 8/10/07 | 3649.01 | 3649.13 |
| 8/1/07-8/31/07 | 9/20/07 | 9/25/07 | 3649.01 | 3649.13 |
| 8/1/07-8/31/07 | 9/20/07 | 9/25/07 | 3649.01 | 3649.13 |
| 9/1/07-9/30/07 | 10/16/07 | 10/30/07 | 3531.30 | 3531.42 |
| 9/1/07-9/30/07 | 10/16/07 | 10/30/07 | 3531.30 | 3531.42 |
| 10/1/07-10/26/07 | 11/7/07 | 11/21/07 | 3158.22 | 3158.31 |
| 10/1/07-10/26/07 | 11/7/07 | 11/21/07 | 3158.22 | 3158.31 |

184.    Patient 26 was admitted to hospice by HCK on June 11, 2007.  On
October 1, 2007, HCK's ARNP indicated that Patient 26 did not use oxygen, had
improved significantly since admission, and should be discharged.  On November 29,
2007, the IDT noted that Patient 26 refused oxygen and had not experienced weight
loss.  On December 17, 2007, the History and Physical indicated that Patient 26 did not
use oxygen and experienced no shortness of breath.  On December 19, 2007, HCK's
ARNP wrote that Patient 26 had improved significantly since September, 2007,
ambulated independently, was independent in activities of daily living, did not use
oxygen, and had an oxygen saturation of 96-98% on room air, and needed to be
discharged.  Patient 26 was not discharged until February 1, 2008.  Between October 1,
2007, and February 1, 2008, defendants submitted the following claims to Medicare and
received the following reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 10/1/07-10/31/07 | 11/7/07 | 11/21/07 | 4002.12 | 4092.58 |
| 11/1/07-11/30/07 | 12/10/07 | 12/13/07 | 3960.60 | 3960.56 |

| | | | | |
|---|---|---|---|---|
| 12/1/07-12/31/07 | 1/10/08 | 1/15/08 | 4092.62 | 4092.58 |
| 1/1/08-1/31/08 | 2/11/08 | 2/14/08 | 4092.62 | 4092.58 |
| 2/1/08-2/1/08 | 3/13/08 | 3/18/08 | 132.02 | 132.02 |

185.    Patient 27 was admitted to hospice by HCK on June 23, 2006.  On December 14, 2006, the History and Physical indicated that Patient 27, with a primary diagnosis of dementia, was continent and had a very good vocabulary.  On December 19, 2006, HCK's ARNP wrote that Patient 27 was inappropriate for the diagnosis of dementia.  On August 3, 2006, HCK's ARNP expressed concern about Patient 27's eligibility for hospice.  On October 9, 2007, HCK's ARNP wrote that Patient 27 was exhibited very intelligible speech, was inappropriate for end stage dementia, had gained 11.3 pounds in the prior six months, and did not appear terminal.  Patient 27 did not expire until March 20, 2008.  Between December 14, 2006 and March 20, 2008, defendants submitted the following claims to Medicare and received the following reimbursements:

| Service Dates | Date Received | Date Paid | Charged | Paid |
|---|---|---|---|---|
| 12/1/06-12/31/06 | 1/4/07 | 1/10/07 | 3649.01 | 3649.13 |
| 1/1/07-1/31/07 | 2/6/07 | 2/12/07 | 3649.01 | 3649.13 |
| 2/1/07-2/28/07 | 3/5/07 | 3/9/07 | 3295.88 | 3295.99 |
| 3/1/07-3/31/07 | 4/5/07 | 4/11/07 | 3649.01 | 3649.13 |
| 4/1/07-4/31/07 | 5/3/07 | 5/9/07 | 3531.30 | 3531.42 |
| 5/1/07-5/31/07 | 6/5/07 | 6/11/07 | 3649.01 | 3649.13 |
| 6/1/07-6/30/07 | 7/5/07 | 7/11/07 | 3531.30 | 3531.42 |

| 7/1/07-7/31/07 | 8/7/07 | 8/13/07 | 3649.01 | 3649.13 |
| 8/1/07-8/31/07 | 9/20/07 | 9/26/07 | 3649.01 | 3649.13 |
| 9/1/07-9/30/07 | 10/16/07 | 10/30/07 | 3531.30 | 3531.42 |
| 10/1/07-10/31/07 | 11/7/07 | 11/26/07 | 3765.57 | 3765.67 |
| 11/1/07-11/30/07 | 12/10/07 | 12/14/07 | 3644.10 | 3644.20 |
| 12/1/07-12/31/07 | 1/10/08 | 1/16/08 | 3765.57 | 3765.67 |
| 1/1/08-1/31/08 | 2/11/08 | 2/15/08 | 3765.57 | 3765.67 |
| 2/1/08-2/29/08 | 3/13/08 | 3/19/08 | 3522.63 | 3522.72 |
| 3/1/08-3/20/08 | 4/7/08 | 4/14/08 | 2429.40 | 2429.47 |

186.    Additional examples of defendants billing Medicare for hospice services provided to ineligible patients will be demonstrated through discovery and at trial.

## FIRST CAUSE OF ACTION
(False Claims Act)
(31 U.S.C. § 3729(a)(1))

187.    The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

188.    Defendants knowingly presented or caused to be presented false or fraudulent Federal Health Care Program claims for payment or approval for patients that were ineligible for hospice care.

189.    By virtue of the false or fraudulent claims of defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and not more than $11,000 as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

## SECOND CAUSE OF ACTION
(Unjust Enrichment)

190.    The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

191.    The United States claims the recovery of all monies by which defendants have been unjustly enriched.

192.    As a consequence of the acts set forth above, defendants were unjustly enriched at the expense of the United States in an amount to be determined which, under the circumstances, in equity and good conscience, should be returned to the United States.

## THIRD CAUSE OF ACTION
(Payment by Mistake)

193.    The United States repeats and realleges the preceding paragraphs as if fully set forth herein.

194.    The United States claims the recovery of all monies by which defendants have received payment by mistake.

195.    As a consequence of the acts set forth above, defendants were paid by mistake by the United States in an amount to be determined which, under the circumstances, in equity and good conscience, should be returned to the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered

60

in its favor against defendants as follows:

1.      On the First Count under the False Claims Act, for the amount of the United States' damages, to be determined at trial, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.      On the Second Count for unjust enrichment, for the damages sustained, and/or amounts by which defendants were unjustly enriched or by which defendants retained illegally obtained monies, to be determined at trial, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

3.      On the Third Count for payment by mistake, for the damages sustained, and/or amounts by which defendants were mistakenly paid and illegally retained, to be determined at trial, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

Date:  June 30, 2010                    Respectfully Submitted,

                                        TONY WEST
                                        ASSISTANT ATTORNEY GENERAL

                                        LANNY D. WELCH
                                        UNITED STATES ATTORNEY
                                        District of Kansas

                                        s/ Jon P. Fleenor
                                        JON P. FLEENOR
                                        Kansas Bar # 14002
                                        Assistant United States Attorney
                                        500 State Ave., Suite 360
                                        Kansas City, KS 66101
                                        Tel: (913) 551-6730
                                        Fax: (913) 551-6599
                                        Email: jon.fleenor@usdoj.gov

                                        s/Jonathan I. Katz
                                        JOYCE R. BRANDA
                                        MICHAEL D. GRANSTON
                                        JONATHAN I. KATZ, Trial Counsel
                                        Attorneys, Civil Division
                                        U.S. Department of Justice
                                        Post Office Box 261
                                        Ben Franklin Station
                                        Washington, DC 20044
                                        Tel: (202) 353-8211
                                        Fax: (202) 514-7361
                                        Email: jon.katz@usdoj.gov

                                        Attorneys for the United States of
                                        America