**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **BEVERLY LANDIS,** | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| | ) Case No. 06-2455-CM |
| **HOSPICE CARE OF KANSAS, LLC** and **VOYAGER HOSPICECARE, INC.,** | )<br>)<br>)<br>) |
| Defendant. | )<br>) |

**MEMORANDUM AND ORDER**

The United States and Beverly Landis[1] ("Plaintiffs") bring this action under the Federal Claims Act, 31 U.S.C. § 3729 et seq., and the common law or equitable theories of unjust enrichment and payment by mistake. The Complaint[2] alleges that defendants Hospice Care of Kansas, Inc. ("HCK") and Voyager Hospicecare, Inc. ("Voyager") knowingly submitted false or fraudulent claims to Medicare in violation of 31 U.S.C. § 3729(a)(1).[3] This matter is before the court on Defendant Voyager Hospices, Inc.'s Individual Motion to Dismiss the Complaint as to Voyager (Doc. 50) and Defendants' Joint Motion to Dismiss the Complaint (Doc. 52). Defendants request a hearing on their

---

[1] Relator Beverly Landis, a current HCK employee, originally filed this lawsuit on behalf of herself and the United States pursuant to the *qui tam* provisions of the FCA, 31 U.S.C. § 3730(b)(1). The United States intervened pursuant to § 3730(b)(2) and (4) of the FCA.

[2] The court relies on the United State's Complaint ("Complaint") (Doc. 30), filed June 30, 2010.

[3] In its Response, the United States clarified that it is alleging claims under § 3729(a)(1) only. To the extent the United States alleges claims under any other provisions of § 3729, those claims are dismissed pursuant to the United States' representations in its Response. (*See* Doc. 58, at 19−20, 27 n.12.)

motions; however, the court finds that a hearing is unnecessary.  The court makes its ruling on the record before it.  The court denies defendants' motions for the following reasons.

I.      **Background**

HCK, which was purchased by Voyager in September 2004, provides hospice care to Medicare patients.  Overseen by the Department of Health and Human Services ("HHS"), Medicare is directly administered by the Centers for Medicare & Medicaid Services ("CMS"), an HHS agency.  Hospice care is a benefit provided under Medicare Part A, a 100% federally subsidized health insurance program.  Under Medicare Part A, institutional health care providers, like defendants, provide health care services to Medicare patients and then submit claims to Medicare for reimbursement.  Cahaba Government Benefit Administrators ("Cahaba"), on behalf of CMS, is responsible for processing and paying—with federal funds—HCK's Medicare claims.  Hospices submit claims on a monthly basis and are paid a per diem rate based on the number of days and level of care provided during the relevant period.

Initially, hospice care is available for a 90-day period.  To receive care, the initial 90-day period must be certified by (a) the medical director of the hospice or physician-member of the hospice inter-disciplinary group and (b) the patient's attending physician.  Subsequently, a patient may receive one additional 90-day period and then an unlimited number of 60-day periods.  One of the above-mentioned physicians must certify the patient's terminal condition in writing at the beginning of each subsequent period. Written certification "requires: (1) a statement that the individual's medical prognosis is that their life expectancy is 6 months or less if the terminal illness runs its normal course; (2) specific clinical findings and other documentation supporting a life expectancy of six months or less; and (3) the signature(s) of the physician(s)."  (Doc. 30, at 8, citing 42 CFR § 418.22; Medicare Benefit Policy Manual, Chapter 9, § 20.1.)

To be eligible for hospice care under Medicare Part A, a patient must be certified as "terminally ill" in accordance with 42 CFR § 418.22.  (Doc. 30, at 8, citing 42 CFR § 418.20.)  "Terminally ill" means that a person "has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."  (Doc. 30, at 8, citing 42 CFR § 418.3.)  Cahaba issued Local Coverage Determinations (LCDs) to help providers determine whether an individual is terminally ill.  The LCDs set forth general and disease-specific clinical variables.  It also advises that a patient should be considered for discharge from the hospice if a patient improves to the point where his or her life expectancy is greater than six months from the most recent recertification evaluation or definitive interim evaluation.

To be covered by Medicare, hospice services must be:

> Reasonable and necessary for the palliation and management of the terminal illness as well as related conditions.  The individual must elect hospice care in accordance with § 418.24.  A plan of care must be established and periodically reviewed by the attending physician, the medical director, and the interdisciplinary group of the hospice program as set forth in § 418.56.  That plan of care must be established before hospice care is provided.  The services provided must be consistent with the plan of care.  A certification that the individual is terminally ill must be completed as set forth in § 418.22.

(Doc. 30, at 9, citing 42 CFR § 418.200.)

The United States contends that defendants submitted Medicare claims for ineligible hospice patients and followed business practices that caused the "admission, retention, and submission of claims to Medicare for patients that were ineligible for the hospice benefit." (Doc. 30, at 11, 12.) Those business practices included:  setting aggressive census targets for each HCK branch office; staff incentives and monetary bonuses for meeting the aggressive census targets; threatening staff with terminations or reductions in hours if the census fell below targets; instructing staff to inaccurately document the condition of patients to make them appear appropriate for hospice and to avoid detection

if medical files were reviewed by Cahaba; implementing procedures that delayed the discharge or made it difficult to discharge ineligible patients; challenging or ignoring staff and physician recommendations to discharge patients; and disregarding or ignoring compliance concerns raised by an outside consultant.

The complaint sets out examples of these practices, including the following:

- Despite a warning from an outside consultant that incentives based on census could be inappropriate, defendants set up census-based bonus programs. These included the 2005 "Summer Sizzle," "Christmas Cash Blitz," and "Fall Frenzy." In 2007, Voyager began a promotion in which it offered to pay for a trip to Cancun for all HCK full-time staff if HCK maintained an average daily census of 725 patients for 30 consecutive days between September 2007 and September 2008.

- Staff received regular communications from superiors informing them of each branch's census goals, current census, and the need to increase census.

- Training documents instructed staff, "Remember to chart negative . . . Celebrate the good things but no need to document"; "Don't document discharge planning"; and not to use phrases such as "Stable," "No change," "Slow decline," or "May possibly not be appropriate for hospice." (Doc. 30, at 18−19.) They also instructed staff that a proper recertification note "Accentuates the negatives" but does not use terms such as "Stable, chronic, unchanged" or "within normal limits." (*Id*.)

- An Advanced Registered Nurse Practitioner ("ARNP"), noted in an e-mail that a patient's condition was likely chronic, not terminal; that the patient had gained weight; and that the patient's oxygen saturation was okay. Despite this assessment, the ARNP wrote in the patient's History & Physical, a document usually included in a patient's medical records, that the patient had experienced functional decline and should continue services.

- In February 2006, HCK enacted a discharge policy that mandated a 30-day discharge process for every patient "once the determination has been made that a patient no longer meets the requirements for continued services." (Doc. 30, at 28.) At the end of the 30-day period, an additional review for eligibility was required and a recommendation was sent to the "care team" and the President and Vice President "for review, comment, and/or direction." (*Id*.)

- Outside consultants and employees of HCK informed both defendants that (1) HCK needed to develop more consistent and better review processes, procedures, and education for staff, (Doc. 30, at 20); (2) that HCK was at risk of admitting patients ineligible for hospice, (Doc. 30, at 23); (3) that roughly one-third of the patients referred at the Lenexa branch were ineligible for hospice, and that "there appears to be a

- gate-keeping problem that we need to fix up front." (Doc. 30, at 24, quoting Nov. 2006 email.)

- Voyager tied resources to increasing census. In September 2007, Voyager's Regional Vice President sent an e-mail to several HCK branch executive directors telling them they need to work with their staff to decrease "constant requests for resources." (Doc. 30, at 16.) The email stated, "It is time that we help [staff] understand . . . . To remain financially viable, we must stay within our budgets. Of course, with that said, 'high water covers a lot of stumps.' In other words, when we get our census up, that will free resources." (*Id*., quoting Sept. 2007 email.)

- In October 2007, Voyager's Regional Vice President sent an e-mail stating that the census total was "not acceptable." The Regional Vice President instructed the HCK marketing consultants and executive directors to "kick it into high gear" because "[t]his organization operates on two things, patient care and business development. We are sorely lacking in business development." (Doc. 30, at 18, quoting Oct. 2007 email.)

- In January 2008, Voyager's Regional Vice President sent e-mails on consecutive days to the branch executive directors stating, "Let's PLEASE try to minimize these [live discharges]," and "We really have to find a way to stop all these live discharges." (Doc. 30, at 32, quoting Jan. 2008 emails.)

The Complaint also alleges that defendants had ineffective training and compliance programs that made it likely they would submit false claims for patients ineligible for the hospice benefit.

The Complaint identifies 27 patients plaintiffs allege were not terminally ill but for whom defendants submitted Medicare claims. The Complaint sets forth the factual details underlying the patients' alleged false certifications, the claims submitted by defendants, and the reimbursements paid by Medicare. (Doc. 30, at 33−58.)

## II.     Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must present factual allegations that "raise a right to relief above the speculative level" and must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp v. Twombly,* 550 U.S. 544, 555, 570 (2007); *see also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). The allegations must be enough that, if assumed to be true, the plaintiff plausibly, not merely speculatively, has a claim for relief. *Robbins*

*v. Oklahoma*, 519 F.3d 1242, 1247–48 (10th Cir. 2008). "'Plausibility' in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the [plaintiff 'has] not nudged [its] claims across the line from conceivable to plausible.'" *Id*. (quoting *Twombly*, 550 U.S. at 570). Under this standard, "the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

In ruling on a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court assumes as true all well-pleaded facts in plaintiffs' complaint and views them in a light most favorable to plaintiffs. *See Zinermon v. Burch*, 494 U.S. 113, 118 (1990); *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984).

### III.   Discussion

The FCA "covers all fraudulent attempts to cause the government to pay out sums of money." *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008) (internal quotations omitted). Section 3729(a)(1)[4] provides a cause of action against any person who "knowingly presents, or causes to be presented . . . [to] the United States Government . . . a false or fraudulent claim for payment or approval." *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 709 (10th Cir. 2006). "Knowingly" includes (1) having actual

---

[4] Section 3729 was amended in May 2009. Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, 123 Stat. 1617. Among the amendments, the subsections of § 3729 were reordered. Section 3729(a)(1) was designated as § 3729(a)(1)(A). Section 3729(a)(1)(A) is not retroactive, and thus, does not apply to plaintiffs' claims. *Id*. ("The[se] amendments . . . shall apply to conduct on or after the date of enactment, except that [§ 3729(a)(1)(B)] . . . shall . . . apply to all claims under the [FCA] that are pending on or after [June 7, 2008]."). For clarity, the court will refer to pre-amendment § 3729(a)(1).

knowledge or (2) acting in deliberate ignorance, or reckless disregard, of the truth or falsity of the information. *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 945 n.12 (10th Cir. 2008) (citing 31 U.S.C. § 3729(b)(1)-(3))[5].

The government brings its FCA claims under an "implied-false-certification theory." (Doc. 58, at 19−20.)  Rather than focusing on the payee's statements to the government, claims under an implied-false-certification focus "on the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment." *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1169 (10th Cir. 2010) (citing *Conner*, 543 F.3d at 1218).  The pertinent inquiry for such claims is "whether, through the act of submitting a claim, a payee knowingly and falsely implied that it was entitled to payment." *Id*. at 1169.

The inquiry does not end there.  The false certification, even if implied, must be material to the government's decision to pay the claim. *Id*.  "A false certification is therefore actionable under the FCA only if it leads the government to make a payment which it would not otherwise have made." *Conner*, 543 F.3d at 1219.

When making these allegations, plaintiffs must comply with Federal Rule of Civil Procedure 9(b). *Lemmon*, 614 F.3d at 1172.

   a. **False and Material Claims**

Defendants argue that a medical opinion regarding whether a patient is terminally ill—a life expectancy of less than six months—is a subjective medical opinion that cannot be false.  FCA liability must be based on an objectively verifiable fact; however, facts that rely upon clinical medical judgments are not automatically excluded from liability under the FCA. *See United States ex rel. Morton v. A Plus Benefits, Inc.*, 139 F. App'x 980, 983 (10th Cir. 2005) (agreeing that FCA liability

---

[5] The court disregards defendants' argument regarding whether the government knew of their billing practices because it relies on facts outside of the Complaint.

-7-

must be predicated on an objectively verifiable fact, but acknowledging that the court was not "prepared to conclude that in all instances, merely because the verification of a fact relies upon clinical medical judgments . . . the fact cannot form the basis of an FCA claim."). Additionally, plaintiffs do not allege that the physicians made false certifications independently, but that the physicians could not legitimately exercise their medical judgment because defendants provided false information on which the physicians relied.

Defendants next argue that plaintiffs have not alleged that defendants submitted false claims. But allegations that a defendant caused a false claim to be submitted may be sufficient to state a cause of action under § 3729(a)(1). *See, e.g., United States v. Gwinn*, No. 06-cv-00267, 2008 WL 867927, at *15 (S.D. W.Va. Mar. 31, 2008) (finding sufficient allegations that alleged the defendants supplied information about patients' medical conditions with knowledge that the answers were inaccurate because the defendants caused false claims to be submitted); *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377−78 (5th Cir. 2004) (overruling dismissal of FCA claim and finding that allegations that the defendant caused false claims to be submitted were sufficient even if the defendants did not file the claim). A person need not be the one that submitted the claim to be liable under the FCA; causing the false claim to be submitted is enough. *United States ex rel. Baker v. Cmty. Health Sys., Inc.*, 709 F. Supp. 2d 1084, 1118 (D. N.M. 2010). In such cases, the "appropriate focus of the inquiry is on 'the specific conduct of the person from whom the Government seeks to collect' and whether that conduct causes the presentment of a false claim." *Id*. (quoting *Sikkenga*, 472 F.3d at 714).

The Complaint states such allegations. The United States alleges that by submitting Medicare claims, defendants represented that the patients were terminally ill; that defendants' intentional, reckless business practices lead physicians to inaccurately certify patients as terminally ill; and that

defendants submitted claims even though they knew, or had reckless disregard for the fact, that the patients that were not terminally ill. Additionally, although Voyager did not submit the Medicare claims, the Complaint alleges specific facts regarding how Voyager's conduct led to a fraudulent claim for payment by the Government. Specifically, the Complaint alleges that Voyager pressured employees to certify, recertify, or not discharge patients regardless of whether they were eligible for hospice benefits and disregarded concerns from consultants and employees that their practices created a risk of approving patients who were ineligible for hospice.[6] Thus, plaintiffs have sufficiently alleged that defendants knowingly or recklessly filed, or caused to be filed, false claims for patients who were not in fact terminally ill.

Similarly, the Complaint sets forth facts that the alleged falsities were material. It alleges that to be eligible for hospice care under Medicare the patient must be certified as terminally ill under 42 C.F.R. § 418.22; that "terminally ill" means a person with a life expectancy of less than six months if the illness runs its natural course; that to participate in the Medicare hospice program, a hospice must maintain a record with correct clinical information; and that defendants' business practices led to incorrect records, which in turn led to the false certification of patients as terminally ill. Because a patient must be certified as terminally ill to be eligible for Medicare, false terminally-ill certifications may lead "the government to make a payment which it would not otherwise have made." *Conner*, 543 F.3d at 1219.

   **b. Rule 9(b)**

---

[6] Plaintiffs' claim against Voyager is based on Voyager's direct involvement with the false claims, not simply that Voyager is the parent company of HCK. Accordingly, the court need not address defendants' "alter ego" and "piercing the corporate veil" arguments. *See e.g., United States ex rel. Pfeifer v. Ela Med., Inc.*, No. 07-cv-01460, 2010 WL 1380167, at *14 (D. Colo. Mar. 31, 2010) ("'Relator must be able to demonstrate either that [the defendant] is liable under a veil piercing or alter ego theory, or that it is directly liable for its own role in the submission of false claims.'") (quoting *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 60 (D.D.C. 2007)).

Claims under the FCA require compliance with Rule 9(b).  Pre-*Twombly* cases required plaintiffs alleging FCA claims to plead the "'who, what, when, where and how of the alleged [claim],'" *Lemmon*, 614 F.3d, 1171 (quoting *Sikkenga*, 472 F.3d at 727), which required plaintiffs to identify the "time, place, content, and consequences of the fraudulent conduct."  *Id*.  Post-*Twombly* and *Iqbal*, the rule's purpose remains the same—"to afford defendant fair notice of plaintiff's claims and the factual ground upon which [they] are based."  *Id*. at 1172 (citations and quotations omitted).  Thus, FCA claims "need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme."  *Id*.

Plaintiffs have met Rule 9(b)'s standard by providing specific factual allegations regarding the who, what, when, where, and how of the alleged claims.  The *who*—plaintiffs allege specific acts by each corporation and by employees within the corporations.  The employees are not identified by name, but they are identified by title.  Defendants can easily identify the individuals by cross-referencing the employees' title with the date and the written communication, event, or patient file.  The *what*—plaintiffs allege specific regulations and business practices that allegedly caused the false submissions.  Further, plaintiffs identify 27 patients, specific instances related to those patients that they allege caused false claims, and the false claims submitted for payment.  The *when*—plaintiffs alleged the date, or series of dates, when specific business practices were in use; when communications took place; when claims where submitted; and when the alleged violations occurred.  The *where*—although the specific branch is not always identified, defendants can determine the location by identifying the employee or patient involved in the specific events laid out in the Complaint.  The *how*—the Complaint clearly sets out the scheme plaintiffs allege defendants used to submit hospice claims for ineligible patients.  Plaintiffs provide detailed information regarding how the defendants

used their business practices to allegedly violate the FCA.  They also alleged the conduct that led to the violation, including specific policies and actions taken by their employees.

Plaintiffs are not required to provide a factual basis for every allegation; nor must every allegation contain all the necessary information.  *Lemmon*, 614 F.3d, 1173.  After reviewing the Complaint, the court finds that the allegations in the Complaint are sufficiently specific to identify the who, what, when, where, and how of the alleged claims.  Thus, plaintiffs have satisfied Rule 9(b).

Defendants rely on these same arguments in moving to dismiss plaintiffs' unjust enrichment and payment by mistake claims.  For the reasons stated above, the court finds that plaintiffs have alleged facts sufficient to state a claim for unjust enrichment and payment by mistake.

**IT IS THEREFORE ORDERED** that Defendant Voyager Hospices, Inc.'s Individual Motion to Dismiss the Complaint as to Voyager (50) is denied.

**IT IS FURTHER ORDERED** that Defendants' Joint Motion to Dismiss the Complaint (Doc. 52) is denied.

Dated this 7th day of December, 2010 at Kansas City, Kansas.

s/ Carlos Murguia
**CARLOS MURGUIA**
**United States District Judge**